670 So.2d 420 (1996)
STATE of Louisiana, Appellee,
v.
Luther MILLER, Defendant-Appellant.
No. CR 95-857.
Court of Appeal of Louisiana, Third Circuit.
January 31, 1996.
*423 Donald Whitehead North, Kathleen Elizabeth Petersen, Baton Rouge, for State.
Craig Steve Gunnell, Jennings, for Luther Miller.
Before YELVERTON, WOODARD and AMY, Judges.
AMY, Judge.
Defendant, Luther Miller, appeals his conviction for indecent behavior with a juvenile. Finding no error on the part of the trial court, we affirm.

DISCUSSION OF THE RECORD
Because defendant has alleged insufficiency of the evidence as one of his assignments, we will give only a brief account of the facts here. The victim, E.C., reported that her bus driver, the defendant, had been making sexual advances to her while she rode the bus to and from school. Specifically, the victim reported that the defendant talked dirty to her, brushed up against her, touched her in her private areas, kissed her and told her he would like to have sex with her. These incidents began in 1991 and ended in 1993, when the victim changed to another bus route as a result of complaints she made to school officials. At the time the victim reported the incident to the police, she was sixteen (16) years old and the defendant was fifty-five (55).
Defendant was charged by bill of information filed on March 29, 1993, with indecent behavior with a juvenile, a violation of La. R.S. 14:81. On that same day, defendant, through his attorney, pled not guilty to the charge. After a trial by jury held on January 24 through January 28 of 1994, defendant was found guilty as charged. Defendant filed a Motion for New Trial, which was denied by the trial court. Defendant was then sentenced on December 14, 1994 to thirty (30) months at hard labor, that sentence being suspended and defendant placed on supervised probation for three (3) years. His probation was subjected to the following special conditions, namely that defendant: (1) serve sixty (60) days in the parish jail, be eligible for the work release program and be given credit for time served; (2) pay for the necessary counseling fees of the victim, totaling $2,775.00 and pay $100.00 for medical and drug expenses within the first 34 months of probation on a payback schedule to be worked out by the probation officer; (3) pay court costs within the first 60 days of probation; (4) register as a sex offender in accordance with La.Code Crim.P. art. 895(H); (5) submit to blood and saliva tests in accordance with La.R.S. 15:535 at his own cost; (6) pay $20.00 per month for a supervised probation fee; and (7) be subject to all other conditions of probation as set forth in La. Code Crim.P. art. 895. The trial court suspended execution of the jail sentence until January 9, 1995 at 4:00 p.m. Defendant appeals his conviction.

ASSIGNMENTS OF ERROR NOS. 1, 2 & 10
We will discuss these assignments together since they all concern defendant's objection to the state's exclusion of jurors on the basis of gender. In Assignment of Error No. 1, defendant claims the trial court erred in overruling his objection to the state's use of peremptory challenges to excuse jurors solely on the basis of gender. In Assignment of Error No. 2, defendant asserts the trial court erred in failing to hold a Batson hearing contemporaneously with defendant's objection. We find that the trial court did not err in so ruling. At the time of voir dire, January 24, 1994, the United States Supreme Court had not extended Batson to gender *424 discrimination. Thus, the trial court correctly overruled defendant's objection. On April 19, 1994, however, the Supreme Court held "that gender, like race, is an unconstitutional proxy for juror competence and impartiality." J.E.B. v. Alabama ex rel. T.B.,___ U.S. ___, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). On September 21, 1994, the Louisiana Second Circuit Court of Appeal found the Supreme Court's ruling in J.E.B. applied retroactively to cases pending on direct review and not yet final. State v. Ford, 26,422 (La.App. 2 Cir. 9/21/94); 643 So.2d 293. Finally, on October 17, 1994, the defendant filed a Motion for New Trial, alleging, in part, that prejudicial error occurred by the state's systematic exclusion of males from the jury.
In Assignment of Error No. 10, defendant claims the trial court erred in denying his Motion for New Trial. He argues that in light of the Supreme Court's holding in J.E.B. and the second circuit's holding in Ford, the trial court should have granted a new trial. In J.E.B. the Supreme Court stated the following with respect to the burden of proof in gender discrimination cases:
As with race-based Batson claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. When an explanation is required, it need not rise to the level of a `for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual. (Citations omitted).
J.E.B.,___ U.S. at ___, 114 S.Ct. at 1429-30.
In the case sub judice, at the hearing on defendant's Motion for New Trial, the trial court found the defendant had made a prima facie showing of gender based discrimination:
In this case, the jury of six was composed of one man and five women. The evidence shows that the State used five of its six peremptory challenges against men and four of these were used after the juror had been first tentatively accepted as a juror by the State. It should also be noted during the trial the State also strenuously objected to the removal of Juror Cormier, a woman, who would have been replaced by the alternate who was a man. After considering this evidence, the Court finds that the Defendant has made a prima facie showing of intentional discrimination against men and the State must now give a gender neutral reason for its challenges. The men prospective jurors challenged were Edwin James McCann, James J. McCombs, John L. Peacock, Rayford Trahan, and Arthur L. Artise.
The state then gave its reasons for excluding each of the male jurors listed above.
First, the state addressed Mr. Edwin James McCann's exclusion. According to the state, Mr. McCann testified that his brother had been accused of molesting a stepniece, and that the charge was still pending. The state also noted that he was inattentive, didn't look the prosecution in the eyes and did not seem interested in being in court. When asked if he had any comments on the state's reason for excluding Mr. McCann, defense counsel stated that he did not have a problem with his exclusion.
Second, the state addressed the exclusion of Mr. James J. McCombs. The state asserted that Mr. McCombs indicated he would have trouble convicting the defendant based on the victim's testimony alone. The state also claimed that he was agitated with their questions. Finally, the state claimed that he knew defense counsel since childhood.
In response, defendant claimed that Mr. McCombs stated he would apply the law when asked if he could convict defendant based on the victim's testimony alone. Mr. McCombs also stated that his gender would not affect his belief or disbelief in the victim's allegations. Defense counsel claimed that the prosecution "goaded" Mr. McCombs into making a statement that could be used to exclude him. Finally, defense counsel stated that Ms. Sonnier, who was accepted by the state, also stated she knew defense counsel.
The trial court ruled, however, that the state had good reasons, other than gender, to exclude Mr. McCombs.
*425 Third, the state presented its reasons for excluding Mr. John L. Peacock. According to the state, Mr. Peacock was excluded because he needed something more than the child's testimony to convict the defendant. The defendant responded that the state was just excluding jurors because they felt uncomfortable with them, and because they did not answer the questions just the way the state wanted. The trial court agreed that the state's gut feelings about jurors was not a valid reason for excluding them, and the trial court stated that the defendant's challenge to Mr. Peacock's exclusion was a close call. The state then noted Mr. Peacock's answers to the following questions asked during jury selection:
Q: Do you have any trouble believing adults in our society use children for sexual gratification?
A: Occasionally, probably.
Q: But it's not a widespread kind of thing. You think there are a lot of allegations just made up?
A: Probably.
The prosecution also noted the following excerpt from Mr. Peacock's testimony:
Q: Could you believe a child who comes before you and tells you she was abused by someone and touched by someone or someone tried to kiss her?
Could you believe her testimony if you thinks she's credible?
A: Well, there are lot of circumstances involved.
Q: For example? Could you give us an idea what kind of circumstances?
A: What's she got to back it up with. Anybody can make an accusation. There's got to be something to back it up.
The trial court finally stated, "I would find that it was not totally neutral gender on this one."
The trial court then heard reasons for the state excluding Mr. Rayford Trahan. The prosecution stated that he was excluded because he had a DWI conviction, and the trial court found that to be a gender neutral reason. Finally, the trial court found the state had sufficient reasons to exclude Mr. Arthur Artise since he had a misdemeanor drug charge, he knew the defendant from high school, and he knew Mr. Don Davis, a character witness for the defense.
The trial judge denied defendant's Motion for New Trial. Neither the trial court nor defense counsel mentioned the fact that the trial court did not find the state's reasons for excluding Mr. Peacock to be totally gender neutral. Additionally, defense counsel did not mention this fact in his brief before this court. For these reasons, and because the reasons given by the state for excluding Mr. Peacock could be considered gender neutral, we conclude the trial court's denial of a new trial was correct. As stated in J.E.B., ___ U.S. ___, 114 S.Ct. at 1430, "When an explanation is required, it need not rise to the level of a `for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." We find the state's reasons for excluding Mr. Peacock were based on a characteristic other than gender and were not pretextual. Although defense counsel argued the state's reasons were merely gut feelings, the prosecution did give sufficient, specific reasons which were not merely based on the prosecution's gut feelings. See Ford, 643 So.2d at 298.
As for the trial court's ruling as to the remaining jurors, that ruling should be given great deference: "The trial court, after all, has great discretion in accepting or rejecting the explanation of the party who used the peremptory challenge." Id. Defendant has not shown this court in any way how the trial court abused this discretion in accepting the state's explanation for its exclusion of the remaining jurors. Furthermore, we find the explanations given by the state were based on characteristics other than gender, and were not pretextual. Therefore, we find these assignments lack merit.

ASSIGNMENT OF ERROR NO. 3
In this assignment, defendant claims the trial court erred in overruling his objection to the hearsay testimony of Bobbie Jo Tupper on the grounds that such testimony *426 was not a first report of the incident. Before Ms. Tupper's testimony, the defendant objected to her being used as an initial complaint witness since he alleged that the victim's first complaint was made to her mother. The prosecution argued that the complaint to the victim's mother was only as to the defendant using nasty language, and as such, the victim's first complaint as to the defendant touching her was made to Ms. Tupper. The trial court overruled the objection.
La.Code Evid. art. 801(D) provides in pertinent part:
A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.
Defendant does not contest that Ms. Tupper's testimony regarding the victim's initial complaint is consistent with the victim's testimony. Defendant contests only that Ms. Tupper's testimony does not involve the victim's initial complaint of defendant's sexual assault. For the following reasons, we find that the trial court did not err in admitting her testimony.
Ms. Tupper's testimony provides in pertinent part:
Q: Did [E.C.] ever confide in you about allegations regarding Mr. Miller?
A: Yes, sir.
Q: Tell the Court what she told you.
A: Well, one day we was in the P.E., last hour, and she looked kind of distant I guess; and I asked her what was wrong and she said she didn't want to talk about it. But I kept asking her and she said that her bus driver, Mr. Luther Miller, saidwas telling her things thatlike what he was going to do to her. I don't really know what those things were. She just said what he was going to do to her and that if she told, he threatened her and then she said that he would touch her started touching her on her butt and her vagina and things like that.
Q: Can you remember when she first told you this?
A: My 9th grade year.
The victim, E.C., also testified that Bobbie Jo Tupper was the first person she told that Mr. Miller was touching her in a sexual way. E.C. also testified that when this first started happening to her, she told her mother that she did not like the defendant because he talked nasty to her. The victim's mother testified that when the victim rode the bus, she complained that Mr. Miller was talking nasty to her. The mother told E.C. to ignore the defendant. The victim's mother further testified as follows:
It went on and she kept getting more scared of him and she told me that he would threaten her. And then later on through a boyfriend, Barry Miller, I was told that Mr. Miller was touching her. So, whenever he toldshe told me that, I said, Well, I'm not going to put up with touching.' I said, `talking, you can turn your head and ignore, but touching is not part of the bus route.'
Although the victim told her mother that defendant was talking nasty to her and threatening her, she apparently did not tell her mother that defendant was also touching her. We find that the victim's first complaint as to the details of defendant's sexually assaultive behavior was to her friend, Bobbie Jo Tupper. Thus, we conclude that Ms. Tupper's testimony was properly admitted and that this assignment lacks merit. See State v. Komurke, 560 So.2d 986 (La.App. 4 Cir.), writ denied, 566 So.2d 982 (La.1990); State v. Garay, 453 So.2d 1003 (La.App. 4 Cir. 1984).

ASSIGNMENTS OF ERROR NOS. 4 & 9
Because these two assignments concern the same issue, we will discuss them together. In Assignment of Error No. 4, defendant argues the trial court erred in refusing his request to remove a juror and replace her with an alternate when that juror admitted she was contacted during trial and advised that she was related to the victim and the juror later was named as foreperson. In Assignment of Error No. 9, defendant *427 asserts the trial court erred in denying his Motion for Mistrial because the trial court refused to remove the juror.
On the third day of trial, January 27, 1994, one of the jurors, Judy Cormier, approached the trial court about a telephone call she received from her aunt the night before. A hearing was then held in the trial judge's chambers with Ms. Cormier, the attorneys, the trial judge, and the minute clerk being present. Ms. Cormier stated that her aunt told her that the victim's grandfather and her father were first cousins. She also stated, "We never visited when we were growing up so I didn't know any of these people." Ms. Cormier did not know of the relation during voir dire, nor did she know the victim personally. The trial court told Ms. Cormier not to inform any of the jurors about the relation. Although the record does not reflect that she was asked about her ability to be fair and impartial, the trial court stated later in court that Ms. Cormier indicated that the relation would not affect her verdict. After arguments were given by both counsel, the trial court decided not to remove Ms. Cormier from the jury. Defendant then moved for a mistrial, which was denied by the trial court since it found no substantial prejudice.
The second circuit faced a very similar problem in State v. Holland, 544 So.2d 461 (La.App. 2 Cir.1989), writ denied, 567 So.2d 93 (La.1990). The Holland court was faced with the following situation:
On the morning of the fourth day of trial the judge received a letter from a juror, Arlon Cole. On the previous evening Cole's daughter had informed him she received a telephone call from a person who identified himself as Bill Haynes, a venireman who had been excused. The person told her his (Bill Haynes's) grandfather was related to the victim and that Haynes believed he was related to Cole. Cole reported this to the judge and testified that he did not know whether he was in fact related to Bill Haynes nor was he aware of the degree of kinship between Haynes and the victim. Cole stated that even if he were in some way related to Haynes (and thus the victim), it would not affect him or the process of his decision making, he could be fair and impartial.
Id. at 465.
The Holland court noted the provision in La.Code Crim.P. art. 797(3) which allows for a juror to be challenged for cause if a juror's relationship with the victim would influence the juror's verdict. The court also noted that "[a] trial judge is granted great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed without a showing of an abuse of that discretion." Id. at 465, citing State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). With respect to a juror's relationship to the victim, the Holland court at 465 stated:
Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. (Citations omitted).
The juror testified, and the trial judge found, that any possible relationship would not impair the juror's ability to be impartial. We find no abuse of the trial judge's discretion in denying the challenge for cause.
In this case, we conclude that the trial court did not abuse its discretion in refusing to remove Ms. Cormier because she: (1) did not personally know the victim nor did she know of the relationship prior to the phone call; and (2) informed the trial court that this would not affect her verdict.
Defendant also argued that Ms. Cormier should be removed because any private contact with a juror during trial is presumed to be prejudicial if it concerns the case. Defendant argues this presumption is further sustained when the juror becomes the foreperson. However, the contact in question here did not concern the case. The record substantiates that Ms. Cormier's aunt only told her that she was related to the victim. *428 The record does not reveal that the case itself was discussed in any way.
Finally, the defendant moved for a mistrial because of the trial court's refusal to remove Ms. Cormier from the jury. In Holland, the defendant also moved for a mistrial. Denying the motion, the Holland court noted:
Unless mandated by LSA-C.Cr.P. art. 770, it is committed to the sound discretion of the trial judge and is warranted only if substantial prejudice results which would deprive a defendant of a fair trial. No mandatory grounds for mistrial are presented here....
Disclosure during the trial that a juror is related to the victim does not necessarily prevent a fair trial. As we discussed above, we cannot find that the trial judge erred in concluding that the possible relationship, of which the juror was unaware during voir dire, would not prejudice the defendant or prevent a fair trial. This being the case, the trial judge did not err in denying defendant's motion for mistrial. (Citations omitted).
Holland, 544 So.2d at 465-66.
Likewise, we find that the trial court did not err in finding that the relationship between Ms. Cormier and the victim would not prejudice the defendant or prevent him from receiving a fair trial. Therefore, we conclude the trial court did not err in denying defendant's motion for a mistrial. We find that this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 5
In this assignment, defendant argues that the trial court erred in overruling his objection to the admission of the testimony of Officer James LeJeune and Dr. Al Buxton, whose names were not on the list of witnesses provided to the defendant. Defendant claims he was prejudiced by the testimony since he was not able to question the jurors of any possible relationship with the two witnesses.
Defendant objected to Officer LeJeune's testimony just prior to Officer LeJeune being called. Arguing prejudice because of his inability to question jurors about any relationship with Officer LeJeune, defendant objected to him being called at that stage. The state, on the other hand, argued that Officer LeJeune's testimony was only to verify the fact that he booked the defendant, the time of the booking, and the age of the defendant, none of which are contested in the case. Finding that Officer LeJeune's testimony was not one to which the jury would have to give any weight, the trial court overruled defendant's objection, allowing Officer LeJeune to testify.
Defendant also objected to the testimony of Dr. Alfred Buxton since he was not on the state's list of witnesses. Because the trial court disallowed Delores Cornett to testify since she was treating the victim, the court allowed the state to introduce Dr. Buxton for the limited purpose of testifying as to delayed reporting and omissions of details. Defendant again argues that he was prejudiced by Dr. Buxton's testimony since he was not allowed to question jurors as to any possible relationship with Dr. Buxton.
We find that this assignment lacks merit for two reasons. First, the supreme court has held that a prosecutor's witness list is generally not discoverable in the absence of extraordinary circumstances. State v. Jackson, 608 So.2d 949 (La.1992). As such, it stands to reason that, generally, a defendant does not have a right to question jurors about any relationship they may have with witnesses. Second, defendant has not shown that any relationship between these two witnesses and any member of the jury actually existed. Clearly, defendant has not shown any prejudice.

ASSIGNMENTS OF ERROR NOS. 6, 7, & 8
In these assignments, defendant alleges error occurred because two witnesses violated the sequestration order. Before discussing the individual assignments, we will discuss the facts surrounding the alleged violation.
Midway through trial, defense counsel notified the court that Fenton High School counselor, Oneta Daggett, a witness called by both the state and defense, had reported a possible violation of the court's sequestration *429 order. Allegedly, the victim, and another witness, Bobbie Jo Tupper, discussed Ms. Tupper's testimony while waiting in the district attorney's conference room. By the time the court was notified of the alleged violation, both the victim and Ms. Tupper had already testified.
At a hearing outside of the presence of the jury, Ms. Daggett testified that she was in the conference room with Brian Shaw, Bobbie Jo Tupper, the victim, the victim's mother and father, Bobbie Jo's father and the victim's counselor. When asked if she overheard any conversations, Ms. Daggett replied that she heard the children talking amongst themselves. Her testimony was unclear, however, as to what the children actually discussed. The following is an excerpt from her testimony:
Q: Okay. And did you overhear any specific conversations between them?
A: Brian was saying he didn't know why he had been called because he didn't know anything and Bobbie Jo was saying that she was nervous and she couldn't remember everything and they were just talking with [E.C.] sort of
Q: All right. Go ahead.
A: just sort of discussing
Q: They were discussing their testimony in this case?
A: Sort of, you know, whattrying to remember what [E.C.] had told them.
Q: Bobbie was trying to remember what [E.C.] told her?
A: She was just real nervous, said she was real nervous and couldn't remember. I was behind the counselor. I couldn't really pick up on what they were saying. They were just saying they were nervous about being called.
* * * * * *
Q: Did you overhear [E.C.] tell anything to Bobbie Joe [sic] Tupper concerning Bobbie Jo's testimony?
A: I'm trying to think whatI couldn't really pick out everything but it was somethingit wasshe was justI think reiterating to Bobbie Joe what she had told her.
Q: About what in particular?
A: About when she went in to Mr. Clayton.
The victim, E.C., also testified at the sequestration hearing. When asked about the discussion she had with Bobbie Jo, E.C. stated:
We didn't talk actually about the case, like what's going on. She said, `Are you nervous?' I said, `Yeah,' and I asked her is she nervous. And I said, `Just go in there and tell the truth, just tell the truth.' That's what we exchanged words like that. That's what we said. Then we started talking about other stuff like what was going on in Fenton and how Fenton was closing and stuff.
The victim also stated that Mr. Clayton's name was never mentioned.
Delores Cornett, the victim's counselor, was also present in the conference room with the children during the alleged violation of the sequestration order. When asked if anyone violated the sequestration order, Ms. Cornett stated:
A: There were personal conversations that went on. The kidsthe[E.C.] and Brian and Bobbie Jo, especially Bobbie Jo and Brian, they spoke that they were nervous, they were scared, and they shared conversation like that.
Q: Okay. Did you hear [E.C.] tell Bobbie Jo how to testify or talk to her about what she's going to testify about?
A: What I recall hearing them say was words to the effect of to tell the truth and don'tdon't change your testimony.
Q: Did you hear any conversation regarding Mr. Clayton or what somebody told to Mr. Clayton?
A: If there wasif there was any such conversation as that, I do not recall that.
Finally, Bobbie Jo Tupper testified as to the conversation that she had with E.C. during the sequestration order. Ms. Tupper testified that she might have talked to E.C. and Brian about the case, but most of the *430 time she was trying to get E.C.'s mind off the case. She also denied that E.C. told her how to testify or what to say in court. According to Ms. Tupper, E.C. told her just to tell the truth. She also stated that her testimony was not based on anything E.C. said to her in the district attorney's office. As for as any reference to Mr. Clayton, she stated that his name could have been mentioned, but she was not sure. Finally, she stated that she did not think the sequestration order prohibited her from talking to E.C. about the case.
In his ruling on the alleged violation, the trial judge stated:
I find that there's been a possible violation of the sequestration order but to the extent of it I'm really not clear as to how how much it was violated and exactly what, you know, what actually was discussed. The problem that I have here is thatof course the witness has already testified and the violation has just come to the court's attention. So, I have a different situation than had I known about the violation before the witness testified as to whatof course the law is clear, you know, it's a drastic remedy. The Court has various things it can do. She's alreadyI mean, I can't disqualify the witness. One of the things, I can disqualify the witness. I can't do that. She has already testified. The other thing I can do is instruct the jury some kind of way; but if I get into instructing the jury, I'm really opening up a can of worms at that particular point.
* * * * * *
[Ms. Daggett's] testimony is not clear either. I don't think in this particular case the Court could give an appropriate instruction to the jury that would clear up this situation without being more prejudicial to the Defendant or to the State or what. So, at this particular point, although the Court finds there may be a violation of sequestration, I'm going to hold that I cannot really cure that at this particular point without making the situation worse; and so I'm going to do nothing really concerning that insofar as that insofar as the instruction of the jury is concerned.
In Assignment of Error No. 6, defendant argues the trial court erred in failing to instruct the jury to exclude the testimony of a witness for the state, Bobbie Jo Tupper, who the court had determined violated the sequestration order and discussed the case with the alleged victim. In State v. Worthen, 550 So.2d 399, 402 (La.App. 3 Cir.1989), we stated the following with respect to violations of sequestration orders:
The purpose of the rule [sequestration order] is to assure that a witness testifies from his own knowledge without being influenced by testimony of prior witnesses and to strengthen the role of cross examination in developing the true facts. Violation of a sequestration order does not mandate exclusion of the witness' testimony. Absent evidence that the testimony has been tainted by the violation or that the purpose of the order has been thwarted, the trial judge has broad discretion in permitting the testimony. Disqualification of testimony is disfavored because absent consent, connivance or knowledge of the party for whom the witness is to testify, exclusion would inhibit the search for truth and unfairly penalize the party. (Citations omitted).
In the present case, it is unclear whether the sequestration order was actually violated. Furthermore, Ms. Tupper testified that her testimony at trial was based on her memory and not based on anything E.C. told her in the district attorney's office. Thus, the purpose of the sequestration order was not thwarted. Defendant has not shown that Ms. Tupper's testimony was tainted by a violation, if one actually occurred, or that his ability to cross-examine her was hampered. Furthermore, no evidence was introduced indicating that the prosecution consented or had knowledge of the alleged violation. Therefore, we find that the trial court did not abuse its discretion in refusing to instruct the jury to exclude Ms. Tupper's testimony.
In Assignment of Error No. 7, defendant asserts that the trial court erred in refusing to allow him to put on evidence in regard to the violation of the sequestration order of the court. After his request to exclude Ms. Tupper's testimony and to instruct *431 the jury as to the violation, defendant requested that he be allowed to question Ms. Daggett as to the violation in the presence of the jury. The trial judge denied this request. Defendant has not cited any authority allowing such testimony to be put before the jury. La.Code Evid. art. 615(B) states that, "A court may impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness." Thus, we find that defendant has not shown the trial court abused its discretion in disallowing such testimony to be put before the jury.
In Assignment of Error No. 8, defendant claims the trial court erred in failing to give any instructions to the jury concerning a violation of the sequestration order by the state witness, Bobbie Jo Tupper. As stated above, the testimony was unclear as to whether the sequestration order was actually violated. Because of this, the trial court felt it would be confusing and maybe even more prejudicial to give an instruction to the jury as to the alleged violation. We note that "[r]esolution of sequestration problems is within sound discretion of trial court." State v. Beach, 610 So.2d 908, 914 (La.App. 1 Cir. 1992), writ denied, 614 So.2d 1252 (La.1993), writ denied, 94-1942 (La. 11/11/94); 644 So.2d 389. Defendant has not shown how the trial court abused its discretion by finding that such an instruction would confuse the jury and maybe even cause more prejudice to the parties. Therefore, we conclude that the trial court did not err in refusing to give the jury such an instruction.
Thus, for the foregoing reasons, we find these assignments lack merit.

ASSIGNMENT OF ERROR NO. 11
By this assignment, defendant asserts that the trier of fact erred in finding a verdict of guilty since a rational trier of fact could not have found guilt beyond a reasonable doubt with the evidence submitted. Defendant claims the only direct evidence of his guilt was the testimony of the victim, which he insists was inconsistent.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983); State v. Duncan, 420 So.2d 1105 (La. 1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. Defendant was convicted of indecent behavior with a juvenile, a violation of La.R.S. 14:81 which provides, in pertinent part, that:
Indecent behavior with juveniles is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child's age shall not be a defense.
The following evidence was introduced at trial.
The victim, E.C., testified that between the years of 1991 and 1993, she attended Fenton High School and that defendant, Luther Miller, was her bus driver. According to E.C., the defendant was her bus driver from kindergarten until the tenth (10th) grade, at which time she switched busses. She also testified that the defendant may be some sort of distant relative. When asked what happened when she rode the bus with Mr. Miller, E.C. stated:

*432 At first he just started talking nasty to me and he would say things like, `You would make a good partner to have sex with'; and then he would tell me stories about him and his wife.... He said that when he and his wife have sex, he would get all excited and she would scream and stuff and sometimes hewould pull her hair.
E.C. further testified that when the bus was in her driveway, the defendant would grab her and touch her on her "bottom front part" and her breasts. When she got on the bus in the morning, the defendant would catch her before she could reach her seat and start touching her. She stated that she tried to fight because she did not want the defendant touching her. Describing a specific incident, E.C. testified:
Most of the time it's just him touching me like that and other times I was wearing some shorts and they were baggy and and hehe was holding me in the mornings by my arms and then he slipped one hand up my shorts and he pulled away my panties and his finger touched my private part. And then other times Iwhen I would get on the bus, he would try to kiss me.... He would hold me by my arms each right here (indicating) and he pulled me and then he tried to press his lips up against mine, and one time he actually did.... His lips touched mine and I had my mouth shut so tight and he tried to stick his tongue in my mouth.
E.C. stated that the first person she told about what was happening was her best friend, Bobbie Jo Tupper. When asked why she had not told anyone else, E.C. replied that she was scared of the defendant. The defendant threatened E.C., telling her no one would believe her. When the defendant first started this behavior, E.C. told her mother that she did not like Mr. Miller because he was talking nasty to her. E.C. testified that her mother told her to just ignore Mr. Miller. She further testified that once, while the defendant was driving the bus, he had one hand on the steering wheel and one hand on his thing. When asked where she sat on the bus, E.C. stated that she sat on the passenger side, beside the door in the very front seat. According to E.C., that was her assigned seat, although she did not think everyone else had assigned seats. Finally, E.C. stated that sometimes she and the defendant were alone on the school bus until the defendant picked up Brian Shaw, which took approximately 25 or 30 minutes.
On cross-examination, E.C. admitted that when she gave her statement to Officer Hebert, she said the defendant told her his wife pulled his hair while having sex, but at trial she stated the defendant told her he pulled his wife's hair during sex. She admitted that in her civil deposition, she stated that the defendant touched her about one (1) out of every five (5) days, but at trial she stated that the defendant touched her about three (3) out of every five (5) days. She further admitted that in a letter to her boyfriend, she said the defendant kissed her lots of times, but at trial she stated the defendant kissed her only once and tried to kiss her other times. E.C. also acknowledged that she was incorrect in telling an attorney at her civil deposition that the shorts incident with the defendant happened after the Natural Helpers Retreat (after September 1992). At trial, she stated the shorts incident occurred at the end of her ninth (9th) grade year. Also, regarding the shorts incident, E.C. did not remember telling Michael Cassidy, the district attorney for Jefferson Davis Parish, that the defendant was sitting next to her when the shorts incident occurred.
Charlotte Hebert, a juvenile officer for the city of Jennings and the parish of Jefferson Davis, testified that she took a statement from E.C. in January 1993. Officer Hebert testified that according to the information she received, the defendant was fifty-four (54), at least two (2) years older than the victim.
Mr. David Clayton, the principal at Fenton High School, testified that he first learned of the trouble E.C. was having with the defendant in May of 1992, when Bobbie Jo Tupper approached him. He then called E.C. into his office to talk with her. E.C. told Mr. Clayton that the defendant was hugging her and she wanted it stopped. Mr. Clayton testified that E.C. indicated that she was just tired of being hugged by a relative. He later *433 saw E.C. in the hall and asked her if everything was okay, and E.C. told him everything was okay. It was not until January of 1993, when Victor Miller, a parent of a student who was dating E.C., brought a letter to the assistant principal, Mr. Gerald Hornsby. As a result of the letter, E.C. was interviewed by both Mr. Hornsby and Mr. Clayton. Mr. Clayton then changed E.C.'s bus schedule. Finally, he testified that it would not take thirty (30) to thirty-five (35) minutes for the bus to drive from E.C.'s house to Brian Shaw's house.
Ms. Oneta Daggett, a counselor at Fenton High School, testified that at a Natural Helpers Retreat in 1992, E.C. told her the defendant looked at her funny and made her sit behind him on the bus. Ms. Daggett admitted that E.C. never told her that the defendant was talking nasty to her or that he had touched her private parts.
Mrs. Donnalen Chaisson, the victim's mother, testified that whenever E.C. started riding the bus, she told her that defendant was talking nasty to her. Mrs. Chaisson told her just to ignore the defendant since he was sort of family. According to Mrs. Chaisson, the defendant's wife and E.C.'s stepmother are blood related. When asked what happened after that, she stated that E.C. kept getting more scared because defendant was threatening her. Later, through E.C.'s boyfriend, Barry Miller, Mrs. Chaisson learned that defendant was touching E.C. At that point, she had her first meeting with Mr. Cassidy, the district attorney of Jefferson Davis Parish.
Mr. Cassidy testified about a series of meetings he had with the victim and her family. At the first meeting, on January 19, 1993, the victim was not present. Mr. Cassidy informed Mrs. Chaisson that the allegations, at that point, constituted only simple battery. He then told her to bring E.C. in to talk with him. Mrs. Chaisson and E.C. met with Mr. Cassidy on January 22, at which time E.C. told Mr. Cassidy what happened. He informed them of the elements of indecent behavior with a juvenile, but again informed them that E.C.'s allegations did not constitute that offense. Mr. Cassidy then met with E.C., Mrs. Chaisson, E.C.'s boyfriend, Barry Miller, and his mother, on January 27, 1993. At that meeting, Mrs. Miller told Mr. Cassidy she was taking Mrs. Chaisson to see an attorney about a civil suit against the defendant. At a subsequent meeting on February 10, 1993, Mrs. Chaisson informed him that they had hired an attorney in the civil case. At that meeting, Mr. Cassidy testified that E.C. told him the defendant had sat next to her on the bus and put his hands up her shorts. E.C. also told him that the defendant had threatened her that he would he if she ever told anyone about his activity and that everyone would believe him over her. Mr. Cassidy finally testified that as he remembered E.C.'s statement, the shorts incident occurred after school.
On cross-examination, Mr. Cassidy described E.C.'s demeanor during the interviews as follows: "Very distraught, very soft spoken, often weeping, head down. The last meeting crying to where her face was red, shoulders heaving, not a wailing cry but sniffling, embarrassed, timid." He also stated that he did not take any notes nor recorded any of the interviews with E.C.; therefore, he was relating the conversations to the best of his memory. He admitted that he was not real certain as to a lot of the details. Mr. Cassidy testified it was possible that E.C. was standing up when the shorts incident occurred instead of sitting in the seat next to the defendant. Finally, he stated that he had to drag details out of E.C. during the interviews.
Bobbie Jo Tupper testified that E.C. told her the following regarding the incidents with the defendant:
Well, one day we was in P.E., last hour, and she looked kind of distant I guess; and I asked her what was wrong and she said she didn't want to talk about it. But I kept asking her and she said that her bus driver, Mr. Luther Miller, saidwas telling her things thatlike what he was going to do to her. I don't really know what those things were. She just said what he was going to do to her and that if she told, he threatened her and then she said that he would touch herstarted touching her on her butt and her vagina and things like that.
*434 She also stated that E.C. sat on the right, front seat of the bus.
Brian Shaw, a schoolmate of the victim, testified that E.C. was the first person on the bus, and that she sat in the front seat, on the right hand side. Brian stated that when the defendant talked to E.C., she would stare out the window, like she was ignoring the defendant. He testified that although E.C. usually sat in the front seat, every once in a while she would go to the back of the bus.
Another witness, Jamie Manuel, also testified that E.C. usually sat in the front of the bus, but she would sometimes go to the back. Jamie stated that although he never noticed E.C. crying when he got on the bus, he did notice her eyes were red at times.
Eric Manuel, also a schoolmate of E.C.'s, testified that E.C. sat in the front, right seat of the bus, but would go to the back of the bus at times. Eric stated that E.C. never cried or appeared distraught when he got on the bus. He further testified as to E.C.'s general reputation for telling the truth or not telling the truth. He indicated that E.C. had a reputation for not being truthful.
On rebuttal, the state introduced the testimony of Krystal Shaw. She went to Fenton High School and rode the defendant's bus. When she caught the bus, E.C. was already on the bus. Ms. Shaw stated that she was assigned a seat by the bus driver and most of the older girls sat up front. She testified that a friend pointed out that every time the bus would stop, the defendant would look at E.C. and her sister. When asked if she ever saw the defendant wink at E.C., Ms. Shaw replied, "Oh, yes." She stated that E.C. always sat in the front seat on the right side, and she heard the defendant call E.C. his little girlfriend.
Although he had never interviewed E.C., Dr. Alfred Buxton testified that it was not uncommon for a victim to delay reporting sexual abuse or to omit details about such abuse. When asked why this was so, Dr. Buxton replied:
There's a host of explanations as to why one might not want to report something immediately. Guilt, shame, mistrust, fear, and intimidation. I mean, you name it. There's a number of adult survivors many times don't report until well into their adult years.
After reviewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. The inconsistencies in E.C.'s testimony were mostly in reference to dates of the occurrences and minor details of the sexual abuse, but did not affect the basic allegations she made against the defendant. The jury could have found the testimony of E.C. to be more credible than Eric Manual, and therefore, felt that E.C. was telling the truth with regards to the behavior of the defendant. Therefore, we find this assignment lacks merit.

DECREE
For the foregoing reasons, defendant's conviction is affirmed.
AFFIRMED.