811 So.2d 44 (2002)
STATE of Louisiana
v.
Michael CELESTINE.
No. 2000-KA-2713.
Court of Appeal of Louisiana, Fourth Circuit.
February 13, 2002.
*45 Harry F. Connick, District Attorney, Anne M. Dickerson, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Brian P. Brancato, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III and Judge DAVID S. GORBATY.)
ARMSTRONG, Judge.

STATEMENT OF THE CASE
The defendant, Michael Celestine, was charged by bill of indictment on May 21, 1998, with first-degree murder in violation of La. R.S. 14:30. The defendant pleaded not guilty at his May 26, 1998, arraignment. A twelve-person jury found the defendant guilty as charged on July 19, 2000. On August 24, 2000, the trial court sentenced the defendant to life imprisonment without benefit of probation, parole, or suspension of sentence after a hung jury in the penalty phase of the trial. On appeal, the defendant raises three assignments of error.

STATEMENT OF THE FACTS
Antoinette Ruffin, the defendant's girlfriend, testified that on April 8, 1998, she drove to Winn Dixie Supermarket on Almonaster Boulevard to buy groceries. When she exited her vehicle she noticed a group of young men standing on the corner looking in her direction. She initially *46 thought they were admiring her, but she later concluded that they were admiring her vehicle. Antoinette further testified that when she completed her grocery shopping she returned to the parking lot and discovered that her vehicle was gone. Antoinette realized that the guys on the corner were gone also. The defendant purchased the blue and white Cutlass Antoinette had been driving, so she called the defendant to tell him the vehicle had been stolen. Antoinette also told the defendant that she suspected that the guys who had been admiring the car had stolen it.
Damon Webster, one of the shooting victims, testified that on April 8, 1998, that he, Duntez Dawson, and Jonathan Touissaint were standing and talking to the owner of an auto body shop in his neighborhood, when they noticed the defendant standing on the opposite side of the street staring at them. Damon further testified that when he and his friends returned to his vehicle and drove away, the defendant followed them in a blue Mustang. Damon lived in the neighborhood, so he drove home. After Damon parked his car, the defendant drove along side of his vehicle, rolled down his driver's side window, produced a gun, and started shooting. Duntez was shot first. Damon was exiting the vehicle at the time and was shot in the abdomen. Damon pulled Jonathan from the backseat and covered him with his body. As they lay on the ground the defendant continued to shoot at them. Damon testified that before the shooting began he had an opportunity to see the gun the defendant used, and it was an AK 47. Damon further testified that when the defendant drove away he crossed the street and sat on his front porch. While in the hospital Damon was shown a photographic line-up, from which he identified the defendant as the person responsible for shooting him.
Sarah Ford, a bystander, testified that on April 8, 1998, she heard gunshots as she exited Rachel's corner store. Sarah further testified that she did not see the shooting, but she did see the defendant drive by in a blue two door Mustang. On the day of the shooting Sarah gave a statement to the police, and was later shown a photographic line-up from which she chose the defendant as the person she saw driving the blue Mustang.
Detective Ricky Hunter, of the New Orleans Police Department, testified that he was the lead detective in this case. When the detective arrived on the scene he testified that one of the victims, Damon Webster, was being taken to the hospital. Detective Hunter requested a crime scene technician who photographed the scene. The technician also made a diagram of the scene to indicate where evidence was found. Detective Hunter testified that from the statement given by Sarah Ford he was able to broadcast a description of the vehicle driven by the shooter on the same day of the shooting. Detective Hunter was later able to develop the defendant as a suspect in the shooting. The detective further testified that he was also able to develop a photographic line-up, which he showed to Damon Webster and Sarah Ford. After the identification by Damon Webster, Detective Hunter applied for an arrest warrant and a search warrant. The day after the warrants were obtained, Detective Hunter along with other officers executed them in the early morning hours. When the officer arrived at the defendant's home they found the defendant, his mother, his girlfriend, and his little brother asleep. The police took the defendant, his mother and girlfriend into custody.
The defendant was transported to the Fifth District police station where he was read his rights. Once at the Fifth District station the defendant gave a statement to *47 Detective Patrick Young. Before the statement was taken, the defendant was read his rights once again. The defendant also signed a rights of arrestee form. The defendant's statement was audio recorded and transcribed.
Detective Hunter testified that before the defendant was transported to jail, he was allowed to briefly visit with his mother and girlfriend, who had been released from custody. The detective further testified that when the defendant's mother offered him words of encouragement by saying, "I know you didn't kill anybody and we can get through this", the defendant responded by saying, "but I did kill that man momma."
William Newman, III, a professor of pathology at L.S.U. School of Medicine and contract pathologist for the Orleans Parish coroner's Office, testified that he performed the autopsy on Duntez Dawson. The doctor observed that the victim had gunshot wounds to the right arm, interior neck, and the base of his skull. The doctor further testified that the gunshot wound to the head was definitely fatal. During the autopsy the doctor removed small fragments of metal from the victim's chest cavity. The bullet that injured the victim's right arm traveled into his chest causing damage to his lung. Doctor Newman testified that fragments of bullets are usually found when a high caliber weapon like an AK 47 is used.
Kenneth Leary, a firearms examiner with the New Orleans Police Department, testified that he was able to identify a copper bullet jacket, removed from Damon Webster, as a 7.62 by 39 millimeter, which is the ammunition for an S.K.S. also known as an AK 47. Officer Leary was unable to identify the caliber of a second copper jacket fragment removed from Damon Webster. Officer Leary further testified that he was unable to identify the bullet fragments removed from the body of Duntez Dawson because they contained no striations or markings from the gun used to fire it, and because the weapon used to fire them had not been recovered.

ERRORS PATENT
A check of the record revealed an error patent in the sentencing of the defendant during the twenty-four hour period after denial of an oral motion for new trial, as required by La.C.Cr.P. art. 873, because the defendant did not waive the delay. This court in State v. Collins, 90-1522 (La.App. 4 Cir. 7/30/91), 584 So.2d 356, stated that in situations when the defendant does not challenge his sentence and he does not raise as error the failure of the trial court to wait the twenty-four hours before imposing sentence, the error is harmless.

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant complains that the evidence used to convict him was insufficient because the State failed to disprove self-defense.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must *48 be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984).
La. R.S. 14:30 defines first-degree murder in part as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of a drive-by shooting. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act. La. R.S. 14:10. Specific intent is a state of mind, and as such need not be proven as a fact but may be inferred from the circumstances of the situation and the actions of the defendant. State v. Brooks, 505 So.2d 714 (La.1987).
In the instant case, Damon Webster and Sarah Ford identified the defendant as the shooter. They identified him from a photographic line-up and at trial. There was no issue as to his identification. Both testified that the shooter drove a blue Mustang. Damon Webster further testified, that prior to the shooting the defendant followed him around his neighborhood, in the Mustang and when the defendant got the opportunity he drove along side of the victim's vehicle and began shooting at him and the two passengers in his vehicle. In his audio-recorded statement, the defendant stated that he began shooting at the victims because he feared the occupants of the other vehicle had weapons and they would shoot him once they realized he was following them. However, the defendant further stated after being asked, that he never saw a weapon on the driver nor any of the occupants of the other vehicle. The defendant assumed the occupants of the other vehicle were armed, but the victims did nothing to create in the defendant a fear for his life that justified his claim of self-defense.
It could have been found from the evidence presented that the defendant possessed the specific intent to kill or inflict great bodily harm on more than one person, or to kill a human being during the perpetration of a drive-by shooting. The evidence was clearly sufficient, therefore this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2
In his assignment of error, the defendant complains the trial court erred in failing to grant a mistrial, over defense objection, when the State intentionally introduced false testimony.
Detective Ricky Hunter testified that he collected a blue automobile sun visor as evidence in the homicide from the defendant's home. The detective believed the visor was the kind found in a Ford Mustang, the kind of vehicle the defendant allegedly drove the day of the shooting. However, it turned out the visor belonged to a vehicle of a different make and model. Prior to the detective testifying the State gave defense counsel a written statement making the defense aware of the error regarding the visor.
La.C.Cr.P. art. 841 provides that an irregularity or error cannot be availed of after the verdict unless it was objected to at the time of the occurrence.
On direct examination of Detective Ricky Hunter defense counsel failed to object to the introduction of the officer's testimony concerning the blue sun visor collected as evidence from the defendant's home. Additionally, defense counsel did *49 not object and move for a mistrial until after both sides had rested. Defense counsel's failure to object did not preserve this complaint for appellate review. If the trial court's sustaining of the State's objection to the hearsay testimony was error, it was harmless. The verdict rendered was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182. The shooting victim and an eyewitness identified the defendant as the shooter; therefore, the verdict can be attributed to other evidence and was not affected by this evidence.

ASSIGNMENT OF ERROR NUMBER 3
In his third assignment of error, the defendant complains the trial court erred in failing to grant his motion for new trial based on the fact that an empaneled juror failed to disclose that he knew the victim's family.
The decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951 (La.1982). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. La.C.Cr.P. art. 851; State v. Dickerson, 579 So.2d 472 (La.App. 3 Cir. 4/17/91), modified on other grounds and affirmed, 584 So.2d 1140 (La.1991).
Initially in any trial, there is a presumption of jury impartiality. U.S. v. Winkle, 587 F.2d 705, 714 (5 Cir. (Fla.) 1/11/79). Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the State to show that the influence demonstrated was not prejudicial. State v. Sinegal, 393 So.2d 684, 687 (La. 1981).
In State v. Miller, 95-857 (La.App. 3 Cir. 1/31.96), 670 So.2d 420, the Third Circuit found that it was not prejudicial when an empaneled juror discovered she was related to the victim because the juror did not know the victim personally, and the juror indicated that the relation would not affect her verdict.
In the instant case, juror Rashad McFarland, once he was selected for the jury and was leaving the courtroom, was allegedly heard to say, "Oh, thank you, Lord." During the penalty phase of the trial the State showed an old school picture of the victim to the jury. Mr. McFarland then said he recognized the victim. Beverly Wilson, another juror, testified that Mr. McFarland told her in the jury room that he knew the victim's sister.
The trial court judge in his denial of the defendant's motion for new trial stated:
Who knows why he said "oh, thank you, Lord,".... Mr. McFarland did not realize that he knew the victim until the penalty phase. And at the penalty phase, the vote was ten jurors, including Mr. McFarland, voted to give your client a life sentence and two voted to give him the death penalty; so I really cannot grant this motion for new trial.
The defendant points to the inconsistency in Mr. McFarland's and Beverly Wilson's testimony to show that an extrinsic factual matter prejudiced Mr. McFarland's decision. However, as the trial court pointed out, Mr. McFarland did not realize he knew the victim until the penalty phase of the trial, and when he did realize he knew him he made the court aware of it. Additionally, Mr. McFarland voted to give *50 the defendant life imprisonment rather than the death penalty. Therefore, this assignment of error is without merit.
For the forgoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.