NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-445

STATE OF LOUISIANA

VERSUS

RODERICK S. BRADLEY

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C 15015
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Marc T. Amy, Judges.

AFFIRMED AS AMENDED, AND REMANDED WITH INSTRUCTIONS.

Van Hardin Kyzar, District Attorney, 10th JDC
Billy J. Harrington, Assisstant District Attorney
P. O. Box 838
Natchitoches, LA 71458-0838
(318) 357-2214
Counsel for Plaintiff/Appellee:
State of Louisiana

**Mary Louise Jackson**
**Attorney at Law**
**1515 Ford Street**
**Shreveport,, LA 71101**
**(318) 226-0822**
**Counsel for Defendant/Appellant:**
**Roderick S. Bradley**

**SAUNDERS, Judge.**

On August 21, 2009, the Defendant, Roderick S. Bradley, was charged by bill of information in count one with attempted second degree murder, a violation of La.R.S. 14:30.1 and 14:27, and in count two with violation of a protective order, a violation of La.R.S. 14:79. Following a trial by jury, the Defendant was found guilty on August 10, 2010, of the lesser offense, aggravated battery. The Defendant was sentenced on October 15, 2010, to serve ten years at hard labor with credit for time served. He was also ordered to pay a fine of $3,000 or serve one year in jail. The Defendant's motion to reconsider sentence was summarily denied on November 10, 2010.

The Defendant is now before this court on appeal, setting forth four assignments of error. We affirm the Defendant's conviction and sentence and remand with instructions.

**FACTS:**

On August 2, 2009, police were called to a scene where the victim, Stephanie Bradley, and the Defendant, her husband, were involved in a physical altercation, wherein the Defendant smashed Bradley's head into the taillight of a parked vehicle. Bradley sustained a large laceration across her forehead and a broken vertebra.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there are errors patent.

First, there is a misjoinder in the bill of information. The bill of information charged the Defendant with attempted second degree murder, a violation of La.R.S. 14:30.1 and 14:27, and violation of a protective order, a violation of La.R.S. 14:79.

Louisiana Code of Criminal Procedure Article 493 provides for the joinder of offenses in a single bill of information under limited circumstances, if the offenses joined are triable by the same mode of trial. The offense of attempted second degree murder is triable by a jury, whereas the remaining offense is not. La.Code Crim.P. arts. 779 and 782. Because the Defendant was entitled to a jury trial for the felony charge and was not entitled to a jury trial on the misdemeanor charges, the offenses were not triable by the same mode of trial and should not have been charged in the same bill of information. La.Code Crim.P. art. 493. However, because the Defendant failed to file a motion to quash the bill of information based on the misjoinder, he waived any error.

Second, the trial court failed to delay sentencing for twenty-four hours after it denied the Defendant's Motion for Post Verdict Judgment of Acquittal and Motion for a New Trial. Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In the present case, there was no express waiver of the delay; however, any error would be harmless since the Defendant does not argue excessiveness of his sentence on appeal and does not claim he was prejudiced by the lack of delay. *State v. Boyance*, 05-1068 (La.App. 3 Cir. 3/1/06), 924 So.2d 437, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 553, and *State v. Shepherd*, 02-1006 (La.App. 3 Cir. 3/5/03), 839 So.2d 1103.

Finally, there is an error patent regarding the payment of the fine. At sentencing, the trial court stated in pertinent part: "You are further sentenced to

2

pay fines and costs in the amount of $3,000.00 dollars . . . . If not paid before you get out of jail, then the Court will allow you to pay the $3,000 dollars in equal monthly installments over the period of nine months beginning two months after you get out of jail." The fines and cost were imposed as part of the principal sentence as the Defendant's sentence was not suspended and he was not placed on probation. When imposed as part of the principal sentence, La.Code Crim.P. art. 888 provides that costs and any fine imposed shall be payable immediately. The trial court's order that the fine and costs are to be paid in a payment plan is an error patent. Thus, we amend the Defendant's sentence by deleting the provision regarding the payment plan, and remand to the trial court for it to make an entry in the minutes reflecting the amendment.

**ASSIGNMENT OF ERROR NO. 3:**

By this assignment of error, the Defendant argues that the evidence was insufficient to convict him of aggravated battery. This assignment of error is addressed first in the event the Defendant is entitled to an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992). "When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734.

> The analysis for a claim of insufficient evidence is well-settled:
>
> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact

3

finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The Defendant herein was convicted of aggravated battery, defined in La.R.S. 14:34 as "a battery committed with a dangerous weapon." A battery "is the intentional use of force or violence upon the person of another." La.R.S. 14:33. A dangerous weapon "includes any instrumentality, which, in the manner used is calculated or likely to produce death or great bodily harm." La.R.S. 14:2(3).

On appeal, the Defendant contends that the jury's actions and inquiries during deliberation strongly indicated they did not believe the Defendant attempted to kill the victim or committed an aggravated offense against her. The critical inquiry, however, in determining the sufficiency of the evidence does not involve the actions and questions of the jury during its deliberation of the case. The proper question before this court is whether the jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of aggravated battery proven beyond a reasonable doubt. *Kennerson*, 695 So.2d 1367.

At trial, Officer Derrick Roque with the Natchitoches Police Department testified that on August 2, 2009, he arrived on the scene to find a lot of people yelling, screaming, and moving around. Two people were holding up the victim, Stephanie Bradley, and one person was holding a towel on Bradley's head. The towel and Bradley's face were completely covered in blood, and there was blood on her blouse and pants.

4

Officer Roque questioned the individuals assisting Bradley, but they did not want to get involved. During his investigation of the scene, he observed drops of blood on the ground and fragments of a tail lamp and followed the blood trail to a parked vehicle with a broken tail lamp. The tail lamp had blood, hair, and skin on it. Officer Roque was able to clearly visualize the tail lamp with the use of a flashlight. The lighting, however, was insufficient to capture an image of the tail lamp with a camera. Officer Roque did not collect samples of the hair, blood, and skin from the broken taillight, because he knew the source of the hair, blood, and skin. He did not return to the scene the following day.

Bradley was taken from the scene to the hospital. Once she was cleaned up, Officer Roque photographed the victim's wound. Officer Roque did not know if Bradley's hair was down on her forehead at the time of the offense. Officer Roque took Bradley's verbal statement as she was not able to write at that time.

Detective Sergeant Stan Williams with the Natchitoches Police Department testified that after Officer Roque completed his investigation and was unable to locate the suspect, the Defendant herein, the case was subsequently turned over to the investigations division. Detective Williams believed there was probable cause to obtain a warrant for the Defendant's arrest for attempted second degree murder. On August 4, 2009, the suspect turned himself in. Detective Williams informed the Defendant that the original charge of aggravated second degree battery had been upgraded to attempted second murder.

With the information from Office Roque, Detective Williams was satisfied that there was probable cause to arrest the Defendant. He did not investigate the matter any further, explaining that he did not investigate a case that had already been investigated.

5

Dr. Timothy Collins at the Natchitoches Parish Hospital testified he provided emergency care to Bradley on August 2, 2009. Bradley presented with a twelve centimeter laceration across her forehead and tenderness to the posterior part of her neck. The wound was a full thickness laceration that extended down to the skull. According to Dr. Collins, a great amount of force was necessary to cause such a wound. Dr. Collins identified a CT scan of Bradley's head and of her fifth cervical vertebra, both of which were taken on August 2, 2009. The CT scan revealed a fracture of the articular facet of the C5 vertebra. According to Dr. Collins, the fracture was potentially life threatening as it could have caused neurological damage that would affect her breathing. On cross-examination, Dr. Collins denied any knowledge of Bradley's possible involvement in a car accident a week prior to her visit to the emergency room.

Stephanie Bradley, the victim herein, testified that on August 2, 2009, she was at a party at the Breda Town Community Center held in honor of her brother. Her mother was also at the party. There was alcohol at the party, but she was not drinking. According to Bradley, the Defendant texted her and inquired as to the whereabouts of Bradley and their two children. She told him they were not home. The Defendant texted her again, repeating the question. When Bradley refused to tell him, the Defendant called her, told her he had seen her truck at the center, and instructed her to come outside and talk to him about their children.

When Bradley went outside, she saw the Defendant's vehicle pulled up beside her truck which was located down the road from the building. She approached the Defendant, who was standing outside of his truck, and noticed he looked very angry and full of rage. Bradley asked the Defendant what he wanted. In response, the Defendant stated that Bradley thought everything was funny. Bradley then told the Defendant she did not have time for that and turned around to

6

walk back to the building. The Defendant grabbed her and started choking her. Bradley managed to get loose and took off running. The Defendant then grabbed her by the back and slammed her head into the back taillight of a car. Next, as the Defendant picked her up, Bradley tried to hold on to the nearby fence to prevent him from taking her to his truck, cutting her hand on a barbed wire. The Defendant subsequently dragged her in between the parked cars, told her he was going to kill her, and proceeded to choke her. Bradley screamed, but the Defendant covered her mouth and continued choking her. Bradley thought the Defendant was going to kill her, and she continued to try and get away. Eventually, the Defendant stopped choking her and left the scene.

Bradley went to the hospital where she was diagnosed with a broken neck and a facial laceration that extended down to the skull. About two hours after her arrival, she was transferred via ambulance to Louisiana State University Medical Center in Shreveport, Louisiana, where she was hospitalized for four days. Following her discharge, Bradley continued follow-up treatment for her neck and face. She was on bed rest from August to November, 2009, and was unable to work at that time. She returned to work on December 28, 2009.

Bradley identified a photograph of her facial laceration and testified that the Defendant caused the injury by slamming her head into a car. According to Bradley, her forehead made contact with the car.

Bradley also stated that the Defendant pled guilty to committing aggravated battery upon her in March of 2005. That offense involved a head injury which left a scar on her lower forehead between her eyes. The scar was shown to the jury. Bradley's scar from the instant offense was also shown to the jury.

At the time of the offense, Bradley had stitches in her arm from an accident at work--she cut herself on a tool. Bradley testified that she had not been involved in an automobile accident.

On cross-examination, Bradley testified she was afraid of the Defendant but had no problem meeting with him the night of the offense to talk about their children. When she got close to him and saw his eyes angry and full of rage, she told him she was going back to the building and turned around to walk back. Bradley acknowledged that her statement taken by Officer Roque omitted several details that she testified about at trial. First, the statement did not mention she had cut her hand when she grabbed the fence. Also, the statement did not reflect that the Defendant dragged her between parked vehicles and started choking her or that he looked angry and full of rage. According to Bradley, however, Officer Roque did not ask for specifics--he just told her to make a statement. Also, Bradley's statement was taken the day of her head injury. The statement was offered into evidence by the State on redirect examination, and its entirety was read aloud by Bradley at trial.

When asked about her relationship with the Defendant prior to the offense, Bradley agreed they had an on and off relationship. There were times when they would argue and separate, but they would get back together. Bradley and the Defendant had children together, and during their separations she continued to have contact with the Defendant regarding the children.

Bradley admitted she was deathly afraid of the Defendant after the offense and did not want any contact with him. Although the Defendant was listed as her contact person upon her admission to the hospital, Bradley maintained that she did not provide any such information to the hospital that night. According to Bradley,

the contact information was already in her record from prior visits and was not provided to the hospital on the night of the offense.

Bradley also testified she was married to the Defendant but had separated from him in December of 2008. She did not file for divorce prior to the offense because she was not financially able to do so. After the offense, Bradley did not seek a divorce because she wanted to avoid any contact with the Defendant. She planned to file for divorce after the trial concluded.

Lastly, Bradley admitted that in the past she was a social drinker. However, Bradley stated that she had not been drinking on the night of the offense. She denied using any drugs that night other than pain medication that had been prescribed for the injury to her arm.

Marlene Carter, the Defendant's mother, testified that Bradley and her son had been married for ten years. During the course of their marriage, she had never known there to be a problem between the two.

The Defendant testified on his own behalf and denied trying to kill Bradley. According to the Defendant, Bradley alleged that he tried to kill her because of "jealousy." He explained that in the past, he had always returned home when they separated. The last time they separated, however, they did not settle their differences.

The Defendant stated that on the night of the offense, he talked to Bradley on the phone, and she told him she was at a party at Breda Town Community Center. When he asked her if he could come by and discuss matters regarding their children, Bradley agreed to meet with him that evening. Because there were no parking spots available near the building, the Defendant parked beside Bradley's vehicle so once she was in clear view, he could get out and talk to her. The Defendant estimated he was twenty-five to thirty yards away from the building.

The Defendant saw Bradley exit the building alone. He maintained she was intoxicated and staggered all the way down to her vehicle. The Defendant had his head lights on so Bradley could see him.

Next, the Defendant testified he got out of his vehicle and stood beside the driver's side of his vehicle. Bradley proceeded to her vehicle and leaned up against the hood. He estimated they were about five feet apart from each other. The Defendant denied grabbing Bradley's head and slamming it up against a car. He did not throw her up against a car, push, or trip her in any way. The Defendant learned about the offense from the newspaper—his name and picture were in the newspaper. He then proceeded to the police station to "try and clear it up." About fifteen minutes following his arrest for battery, Detective Stan Williams informed him that the charge was being upgraded to attempted second degree murder. The Defendant chose not to make a statement because he did not know what he was accused of having done.

On cross-examination, the Defendant maintained he would not want to hurt Bradley. He admitted, however, that during an argument prior to the instant offense, he hit Bradley in the head with "something," and it injured her head. The incident was the basis for his aggravated battery conviction.

When asked why he went to see Bradley on the night of the offense, the Defendant testified that he needed to tell her he was getting ready to move back to Houston, Texas because he had been laid off and needed to find another job. He intended to tell Bradley that once he resumed working, he would send her money to help with the bills. When asked about the urgency to speak with Bradley at 10:30 p.m. on Saturday when he was not moving until Monday or Tuesday, the Defendant stated he was unable to talk with her on Sunday after church because he needed to pack his bags and service his vehicle. The Defendant denied ever

10

getting closer than five feet to Bradley on the evening of the offense. He also denied having any knowledge of how Bradley was injured.

On re-direct examination, the Defendant stated he was unable to drive his vehicle up to the community center because the door to the building, when opened, would hit the front of his vehicle. The Defendant testified that after having a two to three minute conversation with Bradley, he got in his vehicle and left. According to the Defendant, Bradley would call him any time of the day or night to ask him to help out with the children. He maintained that the fact he called her at 10:30 on the night of the offense was not a problem for Bradley.

On the evening in question, the Defendant denied threatening or telling Bradley she had better come outside to meet him on the evening in question. He only told her that they needed to talk about the kids and the money issue before he got ready to move. The Defendant stated he was unable to meet with Bradley the following morning, because he did not get up until 10:00 a.m. and had to be at church at 11:00 a.m. He could not wait until Monday to speak to her because he would get up at 6:00 a.m. and leave town.

With regard to his arrest, the Defendant testified that the police did not ask for his clothing or ask to look into his car. He maintained that he would have cooperated if the police had made such a request. The Defendant confirmed, however, that he turned himself in three days after the offense, on August 5, 2009, and he had changed clothes since the date of the offense.

The Defendant continued to assert that he needed to meet with Bradley at 10:30 p.m. on Saturday because he did not get up the next morning until 10:00 a.m. When asked if he could have set his alarm a bit earlier to meet her, the Defendant replied, "No," stating he always set his alarm for 10:00 a.m. According to the Defendant, he did not walk up to the building to meet Bradley because he was not

11

invited to the party and did not know the people at the party. He also stated that the music was so loud that Bradley would have been unable to hear what he was saying. Lastly, the Defendant maintained that the only place to park was in the middle of the street where he had stopped.

At the conclusion of the Defendant's case, the State re-called Bradley on rebuttal. Bradley testified she was not intoxicated nor was she staggering on the evening of the offense. Bradley also maintained it was possible for the Defendant to have parked near to, or in front of, the building. According to Bradley, the Defendant could have pulled up by the door where she exited the building. Although music was playing in the background, Bradley stated she was able to converse with the Defendant via cell phone before she exited the building. Lastly, Bradley testified again that the Defendant inflicted the gash on her head and broke her neck.

On cross-examination, Bradley maintained that she told the nurses and doctors at the hospital she had not been drinking and had not used recreational drugs. According to Bradley, she reported she had taken a prescription pain killer.

Considering the evidence adduced at trial, we find that the evidence was sufficient to prove the Defendant committed aggravated battery. Although there was no eyewitness testimony to support the victim's allegation, Bradley's testimony alone is sufficient. The Louisiana Supreme Court in *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert, denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002), stated:

> As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *State v. Smith*, 430 So.2d 31, 45 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. *See State v. Mussall*, 523

12

So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849-50, *writ denied*, 99-0210 (La.5/14/99), 745 So.2d 12 . . . . The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *Mussall*, 523 So.2d at 1310 (La.1988).

*See also State v. Hood*, 04-666 (La.App. 3 Cir. 2/16/05), 895 So.2d 624, *writ denied*, 05-1432 (La. 2/17/06), 924 So.2d 1006. In the instant case, Bradley's testimony clearly reflects that the Defendant intentionally used force and violence upon her person with the use of a dangerous weapon by bashing her head into the tail lamp of a parked vehicle. With his finding of blood, hair, and skin on the tail lamp involved, the testimony of Officer Roque supports Bradley's allegation and indicates that the taillight of a vehicle was used in the offense. Lastly, the testimony and evidence describing Bradley's injuries indicates that the Defendant's use of the tail lamp/vehicle was calculated or likely to produce death or great bodily harm. Accordingly, there is no merit to this assignment of error.

## ASSIGNMENTS OF ERROR NOS. 1 and 4:

These assignments of error are interrelated and, thus, are considered together. In assignment of error number one, the Defendant argues that the trial court erred when it recessed the panel of prospective jurors for lunch and proceeded to have the parties make their respective challenges in the absence of the jury panel. The Defendant contends that his fundamental right to a fair and impartial trial by a jury of one's peers was violated because he did not have the opportunity to rehabilitate the prospective jurors when they were challenged for cause. As a result, the Defendant concludes in assignment of error number four that the trial court erred in denying his motion for a mistrial on the basis that the prospective jurors were not available during the time period for challenging and/or striking jurors.

During jury selection in the instant case, both parties had the opportunity to examine prospective jurors during *voir dire*. At the conclusion of *voir dire*, the prospective jurors were released for lunch, and the trial court instructed the State to begin with its challenges. Counsel for the Defendant responded:

> MS. JACKSON: Excuse me Your Honor before uh, we go to picking a jury I have some concerns and I may be in essence making an objection. It's my understanding unless I misunderstand the procedure here, whenever we, even though we're doing challenges right now . . .
>
> THE COURT: Yes ma'am.
>
> MS. JACKSON: . . . peremptory and cause challenges.
>
> THE COURT: Yes ma'am.
>
> MS. JACKSON: It's my understanding and it is the practice that the jurors should be present in the event that any of the attorneys wants to challenge the jury for cause because we still, it's still integrated into the voir dire of that particular panel.
>
> THE COURT: Never done that before. If you had questions to ask you should have asked them during the voir dire that's what the voir dire was for.
>
> MS. JACKSON: Your Honor I'd like to, you know, note my objections and reserve my objection for appeal to this procedure cause . . .
>
> THE COURT: Let her objection be noted.
>
> MS. JACKSON: . . . it is a procedure error and it is also a legal error as to being prejudicial to the defendant to be able to challenge the jury at the . . .
>
> THE COURT: You may challenge the jurors . . .
>
> MS. JACKSON: . . . specific times you make the cause.
>
> THE COURT: . . . that is what we are going to do. But you had the opportunity to question them during voir dire.
>
> MS. JACKSON: Your Honor that's why we raised the objection to the cross.
>
> THE COURT: And I told you . . .

14

MS. JACKSON:    Note my objection Your Honor.

THE COURT:    . . . at that time that no one has asked for an individual voir dire which would have been granted had it been asked for.

MS. JACKSON:    Note my objection Your Honor.

THE COURT:    All right let it be noted.

The Defendant raised his objection again when the State challenged Matthew Braxton for cause based on the his relation to the Defendant.    Defense counsel objected to the challenge as follows:

MR. FLORENCE: And Your Honor we object uh, again as previously stated based on their cause, we'd like to ask him about that relationship because in the, if they're only challenge for cause is his relationship specifically in the statute uh, if that's granted that would get rid of if not the majority of the jurors, not just the witness that know our client but also the witnesses who specifically said they're close friends with the D.A.  If the only reason is for relationship . . .

THE COURT:    Well this particular one was that he was . . .

MR. HARRINGTON:    This is a 797, 797 (7) related by blood, .3 I'm sorry.  Where it's reasonable to . . .

MR. FLORENCE: You said, what was that Article again?

MR. HARRINGTON:    797.3, relationship by blood where it's reasonable to conclude that he would not be able to be impartial.

MR. FLORENCE: That's    a    misstatement    of    the    statute. "Relationships whether by blood, marriage, employment, friendship or enmity between the juror and the defendant.  So it's not just by blood, there's a whole . . .

THE COURT:    Well he is basing his . . .

MR. HARRINGTON:    No but that's my, that's, I'm using the blood here.

MR. FLORENCE:    Right

THE COURT:    . . . he's basing his on a blood relationship in this case.

15

MR. FLORENCE: And that's my statement.  If that's the only basis then we're obviously gonna have the same cause as far as relationship and employment for nearly nine of the jurors Your Honor . . .

THE COURT:     That's possible.

MR. FLORENCE: . . . if it's gonna be placed on blood.

THE COURT:     That is possible sir.  You're right.

MR. FLORENCE: I just want to make sure that . . .

THE COURT:     Mr. Harrington, do you have anything further?

MR. HARRINGTON:     No ma'am.

THE COURT:     Is he not the only person on, the juror, on the uh, in this group that is related to him?

MR. FLORENCE: He's the only individual who stated that he's related to him.  And again Your Honor this goes to the reason the jury, potential jury panel should be available.  We could actually have them if there are any questions.

THE COURT:     You could have asked all those questions when they were available for . . .

MR. FLORENCE: We didn't know this was gonna be a challenge for cause.

THE COURT:     . . . for questioning.

MS. JACKSON:   That's right.

MR. FLORENCE: We didn't know he was, we didn't know this was gonna be a challenge for cause.

THE COURT:     You should have known it because you knew that he was related.

MS. JACKSON:   No that's not true.  That's not true.

THE COURT:     The question was certainly available.  He said he was related to the defendant.

MR. FLORENCE: Your Honor and that's fine again.  So I understand his only basis for challenging this individual for cause is blood relationship?

THE COURT:     Mr. Harrington, how about expanding.  Tell us your entire feelings about this please so we have a good record.

16

MR. HARRINGTON:     Well he, you know, concerning his uh, you know he also said uh, that he knew the defendant and then later said, you know, he was related to him.  He's heard about the case from family members.  He knows and apparently must be also related to the defendant's mother Marlene who is listed as a witness and uh, based on the Code of Criminal Procedure feel like their relationship would make it reasonable to conclude that he could not be fair and impartial.

MR. FLORENCE: And again Your Honor, Your Honor the State just made two now, one, blood relationship and two, that his family members told him about the case.  The D.A. specifically asked the question did anyone tell you about the facts of the case and Mr. Braxton specifically said no, they just told me of the case.  No one told him about the facts of the case and again I counted six or maybe more individuals who have heard about the case, questioned by the D.A., said that they had heard about the case or they know about the case as well as them knowing about . . .

MR. HARRINGTON:     The basis for this challenge for cause . . .

MR. FLORENCE: If I may finish . . .

MR. HARRINGTON:     . . . as I have stated is that it is based on his blood relationship with the defendant.

MR. FLORENCE: If that's all then we rest on that.

THE COURT:     I'm going to grant this particular uh, challenge for cause based on the relationship by blood, marriage, employment, friendship or enmity between the juror and the defendant in that it is such that it is reasonable to conclude that it would influence a juror in arriving at a verdict.

MR. FLORENCE: Again note our objection to that rule Your Honor and . . .

THE COURT:     Let it be noted for the record.

MR. FLORENCE: . . . and our objection that we don't have the opportunity to speak with Mr. Braxton to get specifics as to that relationship.

THE COURT:     Let it be noted.

After the selection of jurors from the first panel of prospective jurors, the

Defendant re-uged his objection regarding the absence of the jury during jury

selection. The Defendant then moved for a mistrial, stating it was most prejudicial

17

to proceed without having the opportunity to rehabilitate Braxton because the prospective jurors had been dismissed for lunch. The motion was denied.

Although the Defendant correctly argued that a familial relationship between a defendant and juror, alone, was not sufficient to disqualify a juror, he raised a novel issue which is the sole basis of the error alleged—that he was prejudiced by the absence of the jury during the challenge phase of jury selection. *State v. Miller*, 95-857 (La.App. 3 Cir. 1/31/96), 670 So.2d 420. In support of his argument on appeal, the Defendant refers to La.Code Crim.P. art. 795(A), which reads, "A juror shall not be challenged for cause after having been temporarily accepted pursuant to Paragraph A of Article 788 unless the challenging party shows that the cause was not known to him prior to that time." Article 795, however, does not address the issue. Additionally, the Defendant does not cite jurisprudence that supports his claim.

Referring to La.Code Crim.P. arts. 786 and 788, the court in *State v. Stephenson*, 291 So.2d 767 (La.1974), stated:

> These provisions clearly contemplate that there shall be one voir dire examination of a juror participated in by the enumerated parties, and that upon completion of that examination the State is required to accept or challenge first. Cf. State v. Sheppard, 263 La. 379, 268 So.2d 590 (1972). The State is not required to accept or challenge until the completion of the voir dire examination, and such an examination is not completed until the court, the district attorney and defense counsel have completed asking their questions.

Louisiana Code of Criminal Procedure Article 786 provides:

> The court, the state, and the defendant shall have the right to examine prospective jurors. The scope of the examination shall be within the discretion of the court. A prospective juror, before being examined, shall be sworn to answer truthfully questions asked him relative to his qualifications to serve as a juror in the case.

Louisiana Code of Criminal Procedure Article 788 reads:

> A. After the examination provided by Article 786, a prospective juror may be tendered first to the state, which shall accept or challenge him.

18

If the state accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him. When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror. This Article is subject to the provisions of Articles 795 and 796.

B. If the court does not require tendering of jurors, it shall by local rule provide for a system of simultaneous exercise of challenges.

Although the *Stephenson* court does not address the issue of whether the prospective jurors must be present during the challenge phase of jury selection, the supreme court's interpretation of Articles 786 and 788 indicates that the examination of the prospective jurors concludes before challenges are raised by the parties. As such, the rehabilitation of a prospective juror would necessarily occur during *voir dire*, not at the time the prospective juror is challenged.

Further, the Defendant's claim that he was not afforded the opportunity to rehabilitate the prospective juror challenged for cause, namely Matthew Braxton, is misguided. Braxton was one of the first eighteen people randomly selected from the jury pool to be examined. The record indicates that when the trial court instructed the prospective jurors to provide "who they know and how they know them," Braxton, an associate minister at Mount Pilgrim Baptist Church, stated he knew the Defendant. The trial court then directed the prospective jurors to raise their hands if they had heard or read anything about the Defendant's case. Braxton raised his hand at that time and reported he had heard about the case from family members. After the list of possible witnesses was read aloud by the trial court, Braxton indicated, again, that he knew the Defendant and also his mother, Marlene Carter. Later, he indicated that the Defendant was his cousin and that his relationship with the Defendant would affect his ability to be impartial.

Next, both parties questioned the first panel of eighteen prospective jurors. The State did not question Braxton at that time. The Defendant addressed Braxton,

stressing that being a relative did not automatically disqualify him from serving on the jury. Braxton voiced his understanding and then indicated that his relationship with the Defendant would not prevent him from being a fair and impartial juror. The Defendant subsequently asked the group, including those who previously indicated they could not be fair or impartial, to indicate by a show of hands if the still felt they could not be fair and impartial. None of the prospective jurors raised their hands.

Both parties were allowed to re-examine the prospective jurors. When questioned by the State, Braxton indicated again that he could be fair and impartial, despite his relation to the Defendant. Braxton stated that he heard about the case from another cousin but was not told anything about the facts of the case. The Defendant did not direct any questions to Braxton at that time.

Other than Braxton, the Defendant does not specifically identify any other prospective jurors challenged for cause and whom he was not afforded an opportunity to rehabilitate. With regard to the remaining two panels of prospective jurors, following *voir dire*, the trial court dismissed the prospective jurors for a break while the parties and court staff moved to a smaller courtroom to discuss jury selection. The parties continued with jury selection in the absence of the prospective jurors and without objection by the Defendant.

There are no statutory or jurisprudential requirements for the presence of prospective jurors during the time challenges are made. Without such a requirement and in light of the fact the Defendant was afforded the opportunity to rehabilitate prospective jurors during *voir dire*, there is no merit to the first assignment of error that the trial court erred in releasing the jury panel for lunch and then proceeding with jury selection.

20

Likewise, the Defendant was not entitled to a mistrial based on the trial court's dismissal of the jury panel while the parties exercised their challenges. Further, the alleged ground for a mistrial is not one of the enumerated grounds entitling him to a mistrial set forth in La.Code Crim.P. art. 770. Accordingly, assignment of error number four is also without merit.

## ASSIGNMENT OF ERROR NO. 2:

By this assignment of error, the Defendant argues that the trial court erred by allowing the State to introduce evidence of a non-original, unauthenticated, black and white print of a CT scan image and a CD containing the file of the CT scan. The Defendant complains that the evidence was not previously provided to the Defendant nor timely submitted pursuant to the rules of discovery. The Defendant contends that the evidence was highly prejudicial to his case and had no probative value.

Prior to opening statements, the Defendant objected to a black and white print of a CT scan image taken of the victim's cervical spine on August 2, 2009. The Defendant complained that it was not received until the first day of trial. In response, the State asserted that the victim's medical records were provided to the Defendant months prior to trial, and throughout the records, it indicates the victim had a fractured vertebra and a head injury. The State admitted that when the medical records were received, the actual image of the CT scan was not included, only the radiologist's report interpreting the image of the CT scan. The State urged that in light of report found in the records, the Defendant could have subpoenaed the image of the CT scan at any time. As such, the State maintained there was no prejudice in submitting a photocopy of the image because the results of the CT scan were described in the medical records.

In response, the Defendant argued that the image of the CT scan was highly prejudicial because he had not had an opportunity to verify or review it. The Defendant asserted, however, there was no problem with allowing the doctor to testify as to what was in the medical records.

The trial court noted that Dr. Timothy Collins was scheduled to testify and that it did not believe the State had attempted to keep the image of the CT scan from the Defendant. Although the image was not in the medical records, the trial court found that the medical records contained evidence of the injury. As such, the photocopy of the image was admitted into evidence.

The Defendant objected to the evidence, asserting it was not the original and was not authentic. Further, the Defendant stated that it did not know if the State was introducing the image of the CT scan for the jurors to see or for the doctor to refer to it at trial. The State responded that the doctor would look at it, identify it as adequately depicting Bradley's CT scan, confirm that it was an accurate copy of her CT scan, and then offer it into evidence and show it to the jury. The Defendant continued his objection, arguing that it was not an original and that he did not know the source of the image. The trial court deferred its ruling until the doctor had testified.

Dr. Timothy Collins was tendered and accepted as an expert in the field of emergency medical care. Dr. Collins testified that he treated the victim in the emergency department on August 2, 2009. During his testimony, the State showed a computer disc to Dr. Collins, State's exhibit 2, and the Defendant renewed his objection. Dr. Collins confirmed that the computer disc contained an exact reproduction of Bradley's CT scan taken on August 2, 2009. The State then offered the computer disc into evidence without objection from the Defendant. The Defendant complained, however, that the jury did not have the capability of

reviewing the content on the computer disc. The State then showed Dr. Collins an image identified as State's exhibit 3. Dr. Collins confirmed that the image was a reproduction of Bradley's CT scan and was printed from a file saved on the computer disc. Again, Dr. Collins stated that the exhibit adequately depicted the CT scan taken on August 2, 2009, and subsequently stored on the disc. The image was then offered and received in evidence.

At the conclusion of Dr. Collins' testimony, the Defendant renewed his objection to State's exhibit 3, arguing that it was an alleged print from the computer disc, State's exhibit 2. The Defendant maintained that Dr. Collins reviewed the image on the computer disc using a computer, not a printout of the image. As such, the Defendant asserted that the computer disc was the best evidence for the jurors to see what Dr. Collins testified about. The trial court asked the Defendant how the instant situation was different from allowing an image on a computer to be printed from the computer, and then accepted in evidence. The Defendant maintained that the trial court's scenario was not similar to the instant case. The Defendant asserted that the image Dr. Collins reviewed on the computer screen was much larger than the three inch by five inch, black and white copy of the image and was much more detailed. The Defendant complained that the jury was not allowed to view the best evidence of the image on the computer disc.

In response, the State asserted that Dr. Collins identified the image printed from the computer disc and testified it was an accurate copy. The State compared it to developing a roll of film and printing a photograph from the film. The trial court allowed the printed image to be entered into evidence, reasoning that with today's technology, instead of x-ray films, a computer disc is available, allowing one to print and view the image.

23

In support of his argument on appeal, the Defendant contends that the State violated the rules of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) by tendering evidence on the first day of trial that was crucial, necessary, and/or detrimental to his case, depriving him of the opportunity to review the evidence and prepare an adequate or proper defense. Recently, in *State v. Davis*, 09-1061, pp. 20-21 (La.App. 3 Cir. 4/7/10), 36 So.3d 351, 365 (citations omitted) (quoting *State v. Tate*, 38,576, pp. 15-16 (La.App. 2 Cir. 8/18/04), 880 So.2d 255, 263-64, *writ denied*, 04-2554 (La. 1/14/05), 889 So.2d 268), this court reviewed the necessity for producing exculpatory evidence during discovery:

> The purpose of pretrial discovery procedures is to eliminate unwarranted prejudice to a defendant that could arise from surprise testimony. Discovery procedures enable a defendant to properly assess the strength of the state's case against him in order to prepare his defense. If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such a prejudice may constitute reversible error.

> Under the United States Supreme Court decision in *Brady*, the state, upon request, must produce evidence that is favorable to the accused where it is material to guilt or punishment. This rule has been expanded to include evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. Where a specific request is made for such information and the subject matter of such a request is material, or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the information to the trial judge for an in camera inspection.

> The test for determining materiality was firmly established in *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and has been applied by the Louisiana Supreme Court. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*See also State v. H.A., Sr.,* 10-95, pp. 19-20 (La.App. 3 Cir. 10/6/10), 47 So.3d 34, 47.

The State herein does not dispute the fact that the computer disc and the image of the CT scan printed from the computer disc were not produced prior to the first day of trial. More important, however, is the fact that the Defendant did receive the victim's medical records several months prior to trial, which contained the radiology report describing the findings seen on the CT scan. The Defendant was not surprised at trial to learn that a CT scan was performed on the victim on August 2, 2009, the day of the offense, or that the CT scan indicated she had sustained a fractured vertebra. Accordingly, the Defendant has not shown with reasonable probability that the actual image of the CT scan, whether on computer disc or in print, would have led to a different result had the evidence been disclosed prior to trial.

The Defendant also argues that Dr. Collins was not the person who actually took the picture and, thus, was not the appropriate person to testify to its authenticity. While this is true, Dr. Collins not only ordered the diagnostic test but was accepted without objection at trial as an expert in the field of emergency medicine. The Defendant did not allege at trial, nor does he claim on appeal, that Dr. Collins is not professionally qualified to interpret the CT scan image saved on the computer disc and printed by Dr. Collins. Additionally, as noted by the State on appeal, La.Code Evid. art. 1003.1 provides, "A duplicate may not be deemed inadmissible or excluded from evidence solely because it is in electronic form or is a reproduction of electronically imaged or stored records, documents, data, or other information." Accordingly, this assignment of error is without merit.

**DECREE:**

The Defendant's conviction is affirmed. Given the error patent regarding the Defendant's sentence, this court orders that the payment plan for the fine and

25

costs is deleted from the Defendant's sentence.  We instruct the trial court to note the change in the court minutes.

**AFFIRMED AS AMENDED, REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules– Courts of Appeal, Rule 2–16.3.