STATE OF LOUISIANA       *       NO. 2019-KA-1024

VERSUS       COURT OF APPEAL

JIMMIE J JENKINS       *       FOURTH CIRCUIT

      STATE OF LOUISIANA

      *

      *

      * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 501-484, SECTION "G"
Honorable Dennis J. Waldron, Judge
* * * * * *
**Judge Edwin A. Lombard**
* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Terri F. Love, Judge
Edwin A. Lombard)


Leon Cannizzaro
District Attorney
Donna Andrieu
Assistant District Attorney
Chiefs of Appeals
Irena Zajickova
Assistant District Attorney
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119


      COUNSEL FOR THE STATE OF LOUISIANA


D. Majeeda Snead
William Quigley
D. Kyle Stadtlander
Student Practitioner
Adam Rosenberg
Student Practitioner

LOYOLA LAW CLINIC
540 Broadway Street
New Orleans, LA 70118

COUNSEL FOR APPELLANT

**AFFIRMED**

**SEPTEMBER 30, 2020**

The defendant, Jimmie J. Jenkins, appeals his conviction on two counts of attempted aggravated rape. After review of the record in light of the applicable law and the arguments of the parties, the judgment of the district court is affirmed.

*Relevant Facts and Procedural History*

On October 28, 2010, the defendant was indicted on two counts[1] of aggravated rape in violation of La. Rev. Stat. 14:42, for the sexual assault of S.S.[2] on June 26, 2010. At his arraignment, the defendant pleaded not guilty to both counts.

On February 8, 2013, the State filed its notice of intent to offer similar crimes, wrongs, and/or acts involving the defendant's previous sexual assaultive behavior in July 2007 and May 2010. The district court initially excluded the prior sexual assaults evidence but, on motion for reconsideration, ruled that the evidence could be presented to the jury.

---

[1] The first count was based on forced oral sex and the second on forced vaginal sex.

[2] La. Rev. Stat. 46:1844(W) prohibits the public disclosure of the names, addresses, or identities of crime victims under the age of eighteen and of all victims of sex offenses, but instead authorizes the use of initials and abbreviations. In the "interest of protecting minor victims and victims of sexual offenses," victims and defendants or witnesses whose names can reveal the victims' identities are referred to only by initials. *State v. Williams,* 2017-0544 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 357.

1

The jury selection took place on March 4, 2013. After *voir dire* of the prospective jurors, the defense exercised its twelve peremptory challenges and a jury was empaneled. The two-day jury trial began the following day.

At trial, the State's witnesses included the victim S.S, and two other victims of earlier incidents involving the defendant: K.M., the victim of the sexual assault on July 5, 2007, and N.B., the victim of the sexual assault on May 16, 2010. The State also presented the testimony of Brad Trim, a security guard working in the vicinity of the June 2010 incident and Jeanne Dumestre, the sexual assault examination nurse who examined both N.B. and S.S. at the hospital in May and June 2010. In addition, the State presented the testimony four members of the New Orleans Police Department (NOPD) involved sexual assault investigations pertaining to the defendant: Detective Vernon Haynes testified concerning the June 2010 sexual assault on S.S; Officer Samuel Davis, Jr., and Detective Michael Riley offered testimony concerning the July 2007 sexual assault on K. M.; and Detective Glenell Sentino testified in relation to the May 2020 sexual assault on N.B.

The following pertinent evidence was adduced at trial: Detective Vernon Haynes testified that on June 26, 2010, he was assigned to the NOPD Sex Crimes Unit and called to investigate a sexual assault which occurred in Shakespeare Park, arriving on the scene after the victim, S.S., had been transported to University Hospital. Accordingly, he took a witness's statement, canvassed the area (finding an ID, some keys, a purse, and a pair of eyeglasses), and proceeded to the hospital. At the hospital, S.S. told Detective Haynes that the perpetrator used the name "James." She identified the defendant as her attacker in a photographic line-up shown and returned to Shakespeare Park with Detective Haynes to pinpoint where the attack took place.

Officer Davis testified that on July 5, 2007, he and his partner responded to a call on Felicity Street. Upon arrival in the area, they approached a pickup truck in response to a woman's screams: "He's raping me. He's raping me. He's trying to kill me." They removed a male wearing a t-shirt and socks from the vehicle and handcuffed him. After advising the defendant of his *Miranda* rights, Officer Davis waited for the arrival of the sex crimes unit. Detective Riley of the NOPD Sex Crimes Unit testified that he interviewed the victim, K.M., on July 5, 2007, at the scene and she related she met the defendant in a bar and accepted his offer of a ride, but that the defendant stopped the vehicle on Felicity Street, they struggled, and he twice raped her vaginally.

Detective Sentino testified that in her interview of N.B on May 16, 2010, at University Hospital, N.B. stated that she had been sexually assaulted and named her assailant as "Jimmie Jenkins." She also interviewed the defendant who, after being advised of his *Miranda* rights, stated that he met N.B. at a convenience store, they "hung out" together for a while, she agreed to have sex with him and then "passed out" but upon awakening, claimed she had been raped. When questioned about past rape allegations, the defendant explained to Detective Sentino that in one incident he was in a car with a woman when the police shined a light in the car and "the woman screamed rape" and in the other incident the woman was "on that crack" and "ran out of his house butt naked" saying that defendant raped her. Detective Sentino stated that as a result of her investigation, she prepared a warrant for the defendant's arrest related to the May 2010 incident but subsequently learned that the case had been "refused" by the district attorney's office.

S.S. testified that on June 26, 2010, at approximately 10:45 p.m., she went to a party at the "Big Man's Lounge" with her sister-in-law. After a couple of hours

and four beers, she was ready to leave but could not find her sister-in-law. At that point she met the defendant, told him she needed to find "a way home," and he offered to walk her home. They left the bar together walking, talking, and laughing until he suddenly punched her in the face. When S.S. attempted to run away, the defendant hit her in the back of her head and she fell. The defendant told her to "shut up, shut up," then dropped his pants, and ordered S.S. to "open up your mouth," telling her "Bitch, this is what I do to hos [sic]." With S.S. on the ground, the defendant stood over her and forced his penis into her mouth. S.S. testified he then ordered her to "take off my girdle" and he "put his penis inside of me." Eventually, the defendant moaned and S.S. managed to push him off and escape. Afterwards at the hospital, S.S. met with a detective and identified the defendant as her assailant in a photographic lineup. Thereafter, the detective showed her an ID which depicted the man who raped her. Finally, S.S. identified defendant in court as the man who raped her.

N.B. testified that in May 2010 she arrived in New Orleans from New York and was waiting at the bus station for her sister "to come and get me." She went to a nearby convenience store and, seeing the defendant on his cell phone, asked if she could borrow the cell phone to call her sister. The defendant suggested that she come to his house to wait for her sister and, once there, they had some drinks and then went to a nearby bar. After several hours, the defendant proposed that N.B. go out with him and then remained with defendant for several hours and still her sister had not arrived. The defendant then proposed that N.B. go out with him that night and he would find her a ride home. N.B. agreed and once the date was over, she gathered her belongings in preparation for the ride home but the defendant informed her that she "wasn't going nowhere." In response, N.B.

4

"started screaming Jesus over and over" and the defendant "started punching me in my face and in my head." The defendant then threw her on the bed, performed oral sex for approximately thirty seconds, and placed his penis between her legs. The defendant then took N.B. back to the convenience store where she advised the cashier that she needed to call 911 and he gave her a phone to do so. Following the call, the police arrived on the scene and N.B. related what had transpired and she was taken to the hospital. At the hospital, she was interviewed by a detective and she provided a description of her assailant. Thereafter, N.B. selected the defendant's photograph from a photographic lineup and the defendant was arrested.

Ms. Dumestre, the nurse who examined both S.S. and N.B. at University Hospital, testified as her examination of the victims and what they told her in the immediate aftermath of the sexual assault. Her testimony corroborated the version of events related in the testimony of S.S. and N.B. at trial. Moreover, although her examination of the victims revealed no vaginal tearing in either victim, the testimony of Ms. Dumestre pertaining to the visible bruises and injuries suffered by the victims during the assaults is consistent with the actions of the defendant as described by S.S. and N.B.

Mr. Trim, the security guard, related that on June 26, 2010, he saw a man and woman walking down the road and thought it strange because it was "[k]ind of late for people to be walking around." About thirty minutes later, he heard a female voice screaming, "[p]lease God, help me, please God help me." Mr. Trim and his partner proceeded towards the area in the park from which the screams were emanating and, hearing more screaming, called 911 and then waited for the police to arrive.

5

In response to the evidence and the testimony presented by the State, the defendant testified on his own behalf. He claimed that in the early morning hours of June 26, 2010, he saw a woman (S.S.) on the street and struck up a conversation with her, saying "something dealing with sex." In response, S.S. asked, "[h]ow much you willing to spend," and he replied, "I don't have but $30." According to the defendant, they then walked into the park, he "put the $30 in her hand," and she gave him a "thumbs up" signal. According to the defendant, after the money was exchanged, they started to argue and he asked her to return his money but she refused so he "hit her" and she screamed. Because he heard someone approaching, he "[ran] out of the park." The defendant insisted he did not rape S.S. and did not force her to perform oral sex on him.

The defendant conceded he had prior convictions for simple possession of marijuana, simple possession of cocaine, theft under $500, second degree battery, and simple burglary. He acknowledged knowing K.M. (explaining that he had employed her as a prostitute on several occasions) and N.B, but insisted that he did not rape them. Rather, the defendant testified that in July 2007 he paid K.M. to have sex with him but when the police arrived, K.M. claimed he was raping her. He had no explanation for why the police did not recover any money from K.M. With regard to N.B., the defendant testified that he met her when she wanted to know where she could purchase marijuana and, after N.B. smoked some marijuana, they proceeded to a bar where they drank wine and then went to his apartment where the sexual encounter was consensual, although the next morning he overheard her on the phone claiming that she had been raped.

In response to the State's cross-examination questions pertaining to the assault on S.S., the defendant claimed that S.S. was a prostitute and after he paid

6

her $30, she refused to have sex with him and refused to return his money, so he hit her. Again, the defendant could not explain why the $30 was not recovered from S.S. once she was taken to the hospital.

The defense also presented the testimony of Patricia Williams who stated that she had known defendant for approximately twenty-five years. She testified that in 2010 the defendant lived in an apartment above a bar she owned. According to Ms. Williams, the defendant was in her bar on the night of June 26, 2010, he had a lot to drink, and she gave him a ride to another bar. Ms. Williams also recalled an incident with the defendant involving a girl he met at a bus station because she received a call from defendant (who was renting the apartment above her bar at the time) and asked him what was happening and why the police were at her bar. The defendant informed her that "[t]his girl spent the night with me, now she [is] crying rape."[3]

On March 6, 2013, the jury found the defendant guilty of attempted aggravated rape on both charges. He was sentenced on June 6, 2013, to a fifty-year period of incarceration on each count, to be served consecutively without benefit of probation, parole, or suspension of sentence. In July 2018, pursuant to the defendant's application for supervisory review, this court granted writ and issued an order on July 20, 2018, directing the district court to appoint counsel and conduct a hearing to determine whether defendant was entitled to an out-of-time appeal. The Loyola Law Clinic was appointed to represent the defendant and, on November 5, 2018, the district court granted the defendant's motion for an out-of-appeal. This appeal follows.

---

[3] *Id.* at p. 277.

*Error Patent Review*

A review of the record reveals one error patent which occurred when on June 6, 2013, when the district court sentenced the defendant on the same date that it denied the defendant's motion for new trial and motion for post-verdict judgment of acquittal.

La. Code Crim. Proc. art. 873 provides, in pertinent part: "If a motion for new trial … is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." Sentence may be imposed immediately if the defendant expressly waives the twenty-four hour delay of pleads guilty. *Id.* Sentencing a defendant within the twenty-four hour period is grounds to void the sentence "*if* the defendant challenges the sentence." *State v. Augustine,* 555 So.2d 1331, 1333-1334 (La. 1990) (emphasis added). In this case, however, the defendant does not challenge his sentence on appeal or raise the failure to observe the twenty-four hour delay as error. Accordingly, the error is harmless. *See State v Celestine,* 2000-2713, p. 5 (La. App. 4 Cir. 2/13/02), 811 So.2d 44, 47.

*Assignment of Error 1*

In his first of four assignments of error, the defendant claims that his constitutional rights were violated when the district court denied his challenge for cause with regard to jury venire member James Allen and, after exhausting all of his peremptory challenges, he was forced to accept Mr. Allen as a member of the jury. Specifically, the defendant argues:

> The trial court abused its discretion in denying defense challenge for cause of venireman number seven James Allen who stated he would be more likely to believe his cousin, state witness Detective Vernon Hayes [sic] testimony. Mr. Allen was unequivocal in his responses and maintained his bias even after repeated attempts by the State to rehabilitate.

*Applicable Law*

Article I, § 17 of the Louisiana Constitution guarantees a defendant the rights to a full *voir dire* examination of prospective jurors and to challenge jurors peremptorily. La. Code Crim. Proc. art. 799 provides that in trials of offenses punishable by imprisonment at hard labor, both the defendant and the State each have twelve peremptory challenges.

In addition, La. Code Crim. Proc. art. 797(2) authorizes a challenge for cause when "[t]he juror is not impartial, whatever the cause of his partiality." On review, a prospective juror's responses during *voir dire*, are not "considered in isolation and … a challenge for cause should be granted, even when a prospective juror declares his or her ability to remain impartial, if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. *State v. Mickelson,* 2012-2539, p. 13 (La. 9/3/14), 149 So.3d 178, 187 (citations omitted). The denial of a challenge of cause on the grounds of bias is not reversible error or an abuse of discretion *if* the record shows that the juror was rehabilitated through further inquiry or instruction and subsequently demonstrated "a willingness and ability to decide the case according to the law and the evidence." *Id.* (emphasis added)

The general rule is that a district court's "erroneous ruling" depriving a defendant of a peremptory challenge is a substantial violation of the defendant's rights and, accordingly, "[p]rejudice is presumed when a challenge for cause is erroneously denied and all of the defendant's peremptory challenges are exhausted." *State v. Robertson,* 630 So.2d 1278, 1280 (La. 1994) (citation omitted). This rule is often stated as: to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show that: (1) he exhausted

all of his peremptory challenges; and (2) the trial court erred in refusing to grant his challenge for cause. *State v. Juniors,* 2003-2425, p.8 (La. 6/29/05), 915 So.2d 291, 305 (citations omitted); *see also State v. Mickelson*, 2012-2539, p. 11 (La. 9/3/14), 149 So.3d 178, 185 (a defendant need make only two showings to establish error warranting reversal of a conviction and sentence: (1) the district court erred in refusing to sustain a challenge for cause; and (2) the defendant exhausted all of his peremptory challenges) (citation omitted). However, in *State v. Magee,* 2011-0574 (La. 9/28/12), 103 So.3d 285, *cert. denied,* 571 U.S. 830 (2013), the Louisiana Supreme Court made clear that, although it is not always explicitly stated, there is one additional requirement a defendant must meet before a district court's erroneous error in denying a challenge for cause mandates a reversal:

> Louisiana law requires that, even where a defendant ultimately exhausts his peremptory challenges, he must use one of his remaining peremptory challenges curatively to remove the objectionable juror or waive the complaint on appeal. . . . This requirement, through which the defendant is forced to use a remaining peremptory challenge in order to preserve error in the denial of a challenge for cause, is sometimes referred to as the "strike or waive" rule.

*Id.,* 2011-0574, p. 27, 103 So.3d at 307 (citation omitted); *see also Mickelson,* 2012-2539, p. 11 n. 4, 149 So.3d at 185 n. 4 (citations omitted) ("Where a defendant ultimately exhausts all of his peremptory challenges, he must have had to use one of his peremptory challenges curatively to remove the objectionable juror or waive the complaint on appeal.")

*Analysis*

A review of the record indicates that the questioning of the jury panel began in earnest with the State asking whether jury venire members were acquainted with any of the witnesses. In response to the State's question, Mr. Allen informed the court that he and Detective Vernon Haynes of the New Orleans Police Department (NOPD) Sex Crimes Unit, an investigating officer who was a State witness in this trial were first cousins. Mr. Allen stated that his relationship with Detective Haynes would not make him uncomfortable in rendering a "not guilty" verdict in a case contrary to his cousin's testimony, but conceded that he would be more likely to believe Detective Haynes over other witnesses. Specifically, the *voir dire* dialogue is as follows:

**MS. RODRIGUE [prosecutor]:**
Okay. And Mr. Allen, I saw you had your hand up also. How do you know Detective Haynes?

**MR. ALLEN:**
He's kin. He's kin to me.

**MS. RODRIGUE:**
Okay. How so?

**MR. ALLEN:**
First cousins.

**MS. RODRIGUE:**
And do you think that would affect your ability to sit on this case?

**MR. ALLEN:**
I see him a lot.

**MS. RODRIGUE:**
Do you ever discuss cases with him?

**MR. ALLEN:**
No.

**MS. RODRIGUE:**
Not really? I guess essentially the question is, is, first of all, do you think if you - - if he testified in a case and you return a verdict of

not guilty, would you be embarrassed or leery about going home and seeing him again?

**MR. ALLEN:**
No.

**MS. RODRIGUE:**
No?

**MR. ALLEN:**
No.

**MS. RODRIGUE:**
You'd be fine with that?

**MR. ALLEN:**
Yes.

**MS. RODRIGUE:**
And do you think that you will be more likely to believe him or would you evaluate his testimony as you would any other witness?

**MR. ALLEN:**
*I would be more likely to believe him.* (emphasis added)

**MS. RODRIGUE:**
You would say maybe because you know him you'd be more likely to believe him?

**MR. ALLEN:**
Yes.

**MS. RODRIGUE:**
Okay. And do you think that if the judge instructs you to evaluate each witness the same, do you think you could do that or you think because he's your first cousin you might be a little in a bit of a pickle I guess.

**MR. ALLEN:**
It sounds logical

**MS. RODRIGUE:**

So you think maybe this wouldn't be the best case for you?

**MR. ALLEN:**

I would say yes.

Neither the State nor the district court asked any further questions of Mr. Allen after this. Accordingly, the questioning of Mr. Allen ended with his unrehabilitated declaration that he would be more likely to believe Detective Haynes' testimony over the testimony of other witnesses and that the instant case "wouldn't be the best case for [him]."[4]

In addition, when the defense counsel asked the prospective jurors whether they believed, "in a case as serious as an aggravated rape that the defendant, either through his own testimony or the testimony of some witnesses, has to prove his innocense [sic] to you, one venire member (Mr. Delay) stated that the defendant would have to prove his innocence and a second panelist (Ms. Woodward) responded "no," he does not have to prove his innocence. Mr. Allen essentially came down in the middle of the two responses, stating: "I'm up in the air right now." Again, no further questions were asked of Mr. Allen in an effort to rehabilitate.

Although Mr. Allen clearly should not have been a juror in the case, when the defendant challenged Mr. Allen for cause, the district court denied this challenge. Inexplicably, the defendant did not exercise one of his peremptory challenges on Mr. Allen. In addition, although prospective jurors often make problematic statements in *voir dire*, they are usually "rehabilitated" through specific questioning. In this case, again inexplicably, neither the State nor the district judge asked Mr. Allen any qualifying questions and, as a result, he never

---

[4] The issue of whether defendant's challenge for cause to Mr. Allen should have been granted was raised in connection with defendant's motion for new trial. However, defense counsel at the hearing had not participated in the *voir dire* and, therefore, could not provide details regarding the matter. The State's counsel, who did participate in *voir dire,* recollected inaccurately that the relationship between Mr. Allen and Detective Haynes was through marriage and that Mr. Allen had provided an assurance that he could be fair and impartial. The district court, admitting that it did not have any independent recollection of what had transpired, denied the defendant's motion for new trial, explaining, in part, that the defendant had an adequate remedy on appeal.

claimed that he could be fair and impartial. Rather, Mr. Allen clearly stated without nuance that he would believe an investigating officer (and State witness) over other witnesses. The State also elicited a confirmation from Mr. Allen that this was "not the best case for him to sit upon as a juror." Additionally, in subsequent questioning by defense counsel, Mr. Allen did not commit to the well-established edict that a defendant is presumed innocent until proven guilty, equivocating instead that he was "up in the air right now" and, therefore, was unable to state with certainty that he would not require the defendant to prove his innocence. No one attempted to ask further questions of Mr. Allen to get a commitment that he either would or would not presume defendant's innocence.

Accordingly, viewing the *voir dire* as a whole indicates that Mr. Allen could not properly serve as a juror and should have been struck for cause. Specifically, Mr. Allen's statement that he would be more likely to believe Detective Haynes over other witnesses, as well as his failure to commit to a belief in the presumption of innocence until proven guilty, disqualified him as a juror. It was clear error for the district court to deny the defendant's challenge for cause with respect to Mr. Allen.

However, even though the defendant challenged Mr. Allen for cause and the district court erroneously denied this challenge, this is not reversible error because, although the defendant exhausted all twelve of his peremptory challenges, he did not exercise a peremptory challenges to excuse Mr. Allen. Therefore, under the "strike or waive" rule enunciated in *Magee*, defense counsel's failure to exercise a peremptory challenge to keep Mr. Allen off the jury constitutes a waiver by the defendant of his right to challenge on appeal the district court's ruling. Thus, even though the defendant challenged Mr. Allen for cause and Mr. Allen should have

14

been disqualified as a witness, defense counsel's failure to use one of the defendant's peremptory challenges to strike Mr. Allen from the jury constitutes a waiver of the defendant's right to challenge (on direct appeal[5]) the district court's erroneous ruling under the "strike or waive" rule. Therefore, this assignment of error is without merit.

### *Assignment of Error 2*

The defendant assigns as error the district court's failure to grant a mistrial based on the State's untimely disclosure of K.M.'s rap sheet. Specifically, although the defendant had requested the rap sheet for each of the State's lay witnesses in his motion for a bill of particulars, the State called K.M. to the witness stand without providing the requested information to defense counsel and began questioning her as to her prior charges and convictions. Defense counsel objected and, outside of the presence of the jury, moved for a mistrial based on the State's failure to "provide the rap sheets and/or convictions of [K.M.]."

*Applicable Law*

La. Code Crim. Proc. art. 775 provides that the trial court shall grant a mistrial when prejudicial conduct in or outside of the courtroom makes it impossible for the defendant to obtain a fair trial. "Mistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. Code Crim. Proc. art. 770 are applicable, should only be used when substantial prejudice

---

[5]Whether the defendant has a viable claim on collateral review for ineffective assistance of counsel based on his defense counsel's failure is not before us in this direct appeal. *See Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986) (a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect).

to the defendant is shown." *State v. Castleberry*, 98-1388, p. 22 (La. 4/13/99), 758 So.2d 749, 768. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." *State v. Wessinger*, 98-1234, p. 24 (La. 5/28/99), 736 So.2d 162, 183.

*Analysis*

As evidenced by the sequence of events at trial, the defendant was not unduly prejudiced by the late submission of K.M.'s rap sheet. First, the State's failure in this regard was not based on any intent to waylay defendant. Rather, it was the prosecutor's understanding that defendant was aware K.M. was in prison, stating: "It was my impression that [defense counsel] was aware of this. There is a writ for [K.M.] in the record. He had to have known she was in Saint Gabriel." Second, the defendant was put on notice of K.M.'s incarceration and her prior convictions during opening arguments when the prosecutor, referring to K.M., stated: "She's going to be wearing a jumpsuit. … She's going to tell you she's got several convictions, that she was a heroin addict." Third, and most importantly, the district court, upon learning that defendant did not have K.M.'s rap sheet, immediately halted K.M.'s testimony and the State promptly provided defense counsel with the requested rap sheet. At that point, the trial recommenced but with the testimony of other witnesses, following which, a lunch break ensued. After the lunch break, the district court confirmed that the rap sheet had been provided to defense counsel prior to the lunch break. Detective Sentino was called as the first witness after the lunch break. After Detective Sentino's testimony, K.M. again took the witness stand but by this time, defense counsel had ample opportunity to digest the contents of K.M.'s rap sheet and, on cross-examination, he questioned

16

her about it. Accordingly, there is nothing in the record to support a finding that the defendant was prejudiced by the late production of K.M.'s rap sheet and we find no error in the district court denial of the defendant's requested mistrial.

*Assignment of Error 3*

Next, the defendant asserts that the district court erred in allowing the jury to listen to and watch an audio and video recorded statement made by the defendant to Detective Sentino wherein the defendant admitted that he had been accused of rape in the past. The defendant complains that he requested, in the bill of particulars, for any such statements, but the State did not comply with his request.

*Applicable Law*

Although a district court has wide discretion in fashioning a remedy for late disclosure of information to a defendant, *State v. Knighton,* 436 So.2d 1141, 1153 (La. 1983), even assuming the State failed to comply with discovery procedures such a failure does not automatically require a reversal unless the defendant was actually prejudiced by the untimely disclosure. *State v. Strickland,* 398 So.2d 1062, 1067 (La. 1981).

In Louisiana, a criminal defendant has only a limited right of pre-trial discovery. *State v. Hodges*, 349 So.2d 250, 253 (La. 1977). The discovery articles are intended to eliminate unwarranted prejudice which could arise from surprise testimony and evidence, to permit the defense to answer the State's case, and to allow the defendant to properly assess the strength of the State's evidence in preparing a defense. *State v. Smith*, 99-1020, p. 6 (La. App. 5 Cir. 2/29/00), 757 So.2d 74, 77-78.

La. Code Crim. Proc. art. 716(B) provides, in pertinent part:

> [U]pon written motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature made by the defendant … which the district attorney intends to offer in its case in chief at the trial, with the information as to when, where, and to whom such oral confession or statement was made.

However, although a district court has wide discretion in fashioning a remedy for late disclosure of information to a defendant, *State v. Knighton,* 436 So.2d 1141, 1153 (La. 1983), even assuming the State failed to comply with discovery procedures such a failure does not automatically require a reversal unless the defendant was actually prejudiced by the untimely disclosure. *State v. Strickland,* 398 So.2d 1062, 1067 (La. 1981).

*Analysis*

In discussing the matter at hand, the district court specifically referenced Article 716(B), finding that the State complied with the rule by virtue of the fact that the State timely provided the defendant with a copy of Detective Sentino's police report. It is undisputed that the statement at issue was referenced in the pertinent police report and defense counsel admitted to knowing that defendant provided a statement but lodged no objection to Detective Sentino's testimony regarding defendant's statement.

Moreover, La. Code Crim Proc. art. 768 provides, in pertinent part: "[I]f the [S]tate intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the [S]tate's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence." In the instant matter, the State complied with the above rule, filing on March 4, 2013, the date the *voir dire* proceedings took place, a notice of intention to use confession or statement pursuant to Article 768.

18

Despite the fact that defense counsel, by virtue of Detective Sentino's police report, was notified of the defendant's statement, defense counsel complained that he was not aware that there was an audio and video recording of the statement contained on a CD. Specifically, defense counsel complained: "Judge, what I didn't know was that there was a recorded statement that I haven't even had an opportunity to listen to." However, prior to his objection to the admission of the recorded statement, defense counsel was given an opportunity to listen to the CD recording. As the State explained:

> I text[ed] [defense counsel] via telephone last night [at 8:00 p.m.] and asked him if he had reviewed the CD, that it was in central evidence and property, and that if he had not I would email him a copy of it. He did not respond. I asked him this morning before opening statements if he would like a copy of the statement. He declined and said he would take it up at the point when I attempted to introduce the statement.

Further, as district court noted that the defendant never "petitioned the [c]ourt to order the State to turn over [a recorded statement] or turn over any other material that was to be used at trial, … I cannot find that."

Thereafter, the district court mused regarding what would have transpired had defense counsel timely raised his objection that morning, before Detective Sentino took the witness stand.

> Now, whether [defense counsel] chose to take advantage of a copy of the CD and listen to it last night or this morning, was up to him. He decided to leave it up to the wisdom of the [c]ourt and wait to bring it to my attention when the detective in question took the witness stand…. I would have been in a position early this morning to give you as much as half a day recess. I could of [sic] let the jury go to work or go home and come back at 1:00 in the afternoon, after you had the chance to review this CD.

The district court then proceeded to rule on the admissibility of the CD, first examining La. Code Crim. Proc. art. 729.5(A) which provides:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.

Subsequently, the district court noted that its initial decision was to prohibit the State from introducing the CD into evidence, but after further consideration decided to "reverse myself," taking into consideration the fact that the State had attempted to provide defense counsel with the CD and defense counsel, unfortunately, refused to take advantage of the State's offer.

In the instant case, defense counsel knew the defendant provided a statement to Detective Sentino, having timely received a copy of Detective Sentino's police report. Knowing that the statement was provided to a law enforcement official, the fact that it was audio and video recorded should not have come as a surprise. Further, the State did not attempt to conceal the recorded statement, informing that it was located in "central evidence and property," available for defense counsel's review. Finally, the State attempted to provide defense counsel with the recorded statement, but defense counsel was not interested. Instead, defense counsel waited until Detective Sentino was called upon to offer testimony and then, when the CD was offered into evidence, moved for a mistrial. If defense counsel had taken the State up on its offer and advised the district court of his receipt of the CD that morning, the district court could have fashioned a remedy for the late disclosure in the form of a half-day continuance of trial. Nonetheless, despite the lack of a

20

continuance, the defendant was not actually prejudiced by the untimely disclosure given that K.M., whose rape at the hands of defendant was the subject matter of the recorded statement, offered testimony at trial as did defendant himself. Jurors were well aware, without the recorded statement, that the defendant, in the past, had been accused of rape not once, but twice. Further, Detective Sentino offered testimony, without objection, that the defendant had explained that he had been accused of rape in the past. Thus, the claim that the defendant was unduly prejudiced by the late disclosure of the audio and video recorded statement and by its admission into evidence, is without merit.

### *Assignment of Error 4*

Finally, the defendant argues that even if this court finds that the district court acted appropriately in denying relief with regard to the above-stated assignments of error, "the amount and significance of the errors taken as a whole, resulted in the deprivation of due process for the defendant…."

*Applicable Law*

La. Code Crim. Proc. art. 841(A) provides:

> An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

Pursuant to Article 841(A), this Court does not consider an assignment of error raised for the first time on appeal. *State v. Hill*, 2016-0123, p. 10 (La. App. 4 Cir. 6/1/16), 194 So. 3d 1262, 1268.

*Analysis*

21

A review of the trial transcript reflects that defendant never moved for a mistrial or lodged any objection based upon the cumulative effect of the above-delineated errors. Further, it is well-settled that the cumulative effect of alleged errors complained of by a defendant on appeal, none of which constitutes reversible error individually, neither warrants reversal of a conviction or sentence, nor does it deprive a defendant of his right to a fair trial. *State v. Wells*, 2014-0612 (La. App. 4 Cir. 9/14/16), 203 So. 3d 233, 307, *writ denied,* 2016-1939 (La. 9/6/17), 224 So. 3d 988. This assignment of error is without merit.

*Conclusion*

After review of the record in light of the applicable law and arguments of the parties, the district court judgment is affirmed.

**AFFIRMED**